Sally B. STUTES, Appellant,

v.

Todd SAMUELSON, M.D., Appellee.

No. 2–04–227–CV.

Court of Appeals of Texas,
Fort Worth.

Nov. 3, 2005.

Rehearing and En Banc Rehearing
Overruled Dec. 1, 2005.

Keith Law Firm P.C., Darrell L. Keith, Courtney Keith, Arin K. Schall, Fort Worth, for appellant.

Wallach, Andrews & Stouffer, P.C., J. Wade Birdwell, D. Michael Wallach, C. Davis Chapman, Fort Worth, for appellee.

Panel B: LIVINGSTON, WALKER, and McCOY, JJ.

## OPINION

BOB McCOY, Justice.

### I. Introduction

In two issues, Sally B. Stutes ("Stutes") asserts that the trial court erred in dismissing her suit against Todd Samuelson, M.D., due to the lack of a physician-patient relationship. We affirm.

### II. Background

In November of 2000, Stutes, a registered nurse, found a knot in the area of her right collarbone. Her primary care physician referred her to Dr. Michael Korenman, a general surgeon. He recommended a surgical open .biopsy following his diagnosis of a right supraclavicular mass, which he felt was probably a swollen benign or malignant lymph node. Prior to surgery, Stutes signed two consent forms, one allowing Dr. Korenman to perform the surgery and another for another physician to perform a bone marrow aspiration and biopsy, if required. Both consent forms allowed the physician "and such associates ... and other health care providers to perform such other procedures which are advisable in their professional judgment."

According to Stutes, the plan that she and Dr. Korenman had discussed, and what she believed would occur, was to determine if the mass was malignant, and then following the biopsy, they would jointly decide what to do—there was no discussion with her about removing the mass during the surgery. In fact, she testified that she and her husband had decided that if a malignant mass had to be removed, she would have that done in Oklahoma City. There is no evidence in the record that Dr. Samuelson was aware of any of these plans.

On January 31, 2001, the scheduled surgery occurred. During the surgery, Dr. Korenman located and mobilized the mass in question until it was free except for connections above and below it. At this point, Dr. Korenman stopped and decided that he wanted to "use another physician as a sounding board ... and discuss my thought process at that point in the case. I had hoped that one of the other general surgeons that does the same type of work as I do would have been in the operating suite, but ... they were not at that point." As a result, a circulating nurse asked Dr. Samuelson, who was in the midst of surgery in the adjacent operating room, to "poke your head into [Korenman's] room when you're finished with your case." A few minutes later, after removing his surgical gloves and gown and putting on his watch and ring, Dr. Samuelson went to the operating room of Dr. Korenman and inquired what Dr. Korenman wanted. At this point, Dr. Samuelson had no knowledge of Stutes or her surgery. Dr. Korenman asked questions about the general anatomy of the area and landmarks used to identify lymph nodes. The physicians' recollections differed as to whether Dr. Samuelson offered to scrub-in and assist. Nevertheless, Dr. Samuelson did not scrub-in and did not enter the surgical

field but came within three to five feet of the patient, behind Dr. Korenman, which was not close enough to observe the surgical wound clearly. Also, according to Dr. Korenman's operative report, "I asked the ear, nose and throat physician [Dr. Samuelson, whose name does not appear in the report] to look in, and it was our opinion that this was a high probability malignant lymph node, and needed to be excised." Dr. Samuelson recalled that he was asked to clarify the location of certain muscles and nerves and to confirm that the mass could be a lymphoma, but he also indicated that it could be a nerve-type tumor, which would include neuromas and schwannomas. This was the end of Dr. Samuelson's involvement. Following their discussion, Dr. Korenman decided that his original opinion was correct and that he had not penetrated too deeply to put the brachial plexus layer at risk.

Dr. Korenman then proceeded with the surgery, removed the mass, and sent it to pathology. It was determined to be a benign schwannoma with two nerve fragments attached. Following the surgery, Dr. Samuelson did not prepare or join in an operative report, did not speak to Stutes, and did not bill for any professional services. Dr. Korenman testified that he did not intend to create a physician-patient relationship between Dr. Samuelson and Stutes, that his conversation with Dr. Samuelson was not determinative, and that the decision to remove the mass was his alone. Dr. Samuelson testified that he expected Dr. Korenman to believe what he told him and to rely on the information he provided to him.

Subsequently, Stutes sued the two physicians and Korenman, P.A., and others who were later non-suited, due to "pain, mental anguish, and loss of motor function, and numbness in her right arm and hand" along with "disfigurement, physical impair-

ment, and other injuries and damages" resulting from the surgery. A settlement was reached with Dr. Korenman and Korenman, P.A., and the trial court granted Dr. Samuelson's "traditional" motion for summary judgment based on the absence of a physician-patient relationship between Stutes and Dr. Samuelson. This appeal resulted.

## III. Standard of Review— Summary Judgment

In a summary judgment case, the issue on appeal is whether the movant met his summary judgment burden by establishing that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Tex.R. Civ. P. 166a(c); *Sw. Elec. Power Co. v. Grant,* 73 S.W.3d 211, 215 (Tex.2002); *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678 (Tex.1979). The burden of proof is on the movant, and all doubts about the existence of a genuine issue of material fact are resolved against the movant. *Sw. Elec. Power Co.,* 73 S.W.3d at 215; *Sci. Spectrum, Inc. v. Martinez,* 941 S.W.2d 910, 911 (Tex.1997); *Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co.,* 391 S.W.2d 41, 47 (Tex.1965). Therefore, we must view the evidence and its reasonable inferences in the light most favorable to the nonmovant. *Great Am.,* 391 S.W.2d at 47.

In deciding whether there is a material fact issue precluding summary judgment, all conflicts in the evidence are disregarded and the evidence favorable to the nonmovant is accepted as true. *Harwell v. State Farm Mut. Auto. Ins. Co.,* 896 S.W.2d 170, 173 (Tex.1995). Evidence that favors the movant's position will not be considered unless it is uncontroverted. *Great Am.,* 391 S.W.2d at 47.

A defendant is entitled to summary judgment if the summary judgment evi-

dence establishes, as a matter of law, that at least one element of a plaintiff's cause of action cannot be established. *Elliott–Williams Co. v. Diaz*, 9 S.W.3d 801, 803 (Tex.1999). The defendant as movant must present summary judgment evidence that negates an element of the plaintiff's claim. *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex.1995). Once the defendant produces sufficient evidence to establish the right to summary judgment, the burden shifts to the plaintiff to come forward with competent controverting evidence raising a genuine issue of material fact with regard to the element challenged by the defendant. *Id.*

## IV. The Physician–Patient Relationship

The singular question presented to this court is whether Dr. Samuelson disproved that a physician-patient relationship existed between Dr. Samuelson and Stutes, and hence summary judgment in his favor was proper.

■ To prevail on a health care liability claim, a claimant must show that the health care provider had a duty to act according to certain legal standards and that the applicable standard of care was breached, causing an injury. *Gross v. Burt*, 149 S.W.3d 213, 221 (Tex.App.-Fort Worth 2004, pet. denied). As to a physician, "malpractice is predicated on a physician-client relationship," that is, a physician "cannot be liable for malpractice unless the physician breaches a duty flowing from a physician-patient relationship." *St. John v. Pope*, 901 S.W.2d 420, 423 (Tex.1995). The burden of establishing the existence of this relationship lies with the claimant/patient. *Gross*, 149 S.W.3d at 222. Our Texas Supreme Court has explained,

It is only with a physician's consent, whether express or implied, that the doctor-patient relationship comes into being. Thus we agree with those cases that hold that the duty to treat the patient with proper professional skill flows from the *consensual relationship between the patient and physician*, and only when that relationship exists can there be a breach of a duty resulting in medical malpractice.... Creation of the physician-patient relationship does not require the formalities of a contract.

*St. John*, 901 S.W.2d at 423–24 (emphasis supplied).

■ Contractual terms are often used in discussing the physician-patient relationship. It is created when professional services are offered and they are accepted by another. *See id.* In fact, the relationship is generally viewed as a voluntary and contractual one, which may be implied or express. *Gross*, 149 S.W.3d at 222. The implied contractual relationship may arise from facts and circumstances indicating there was a mutual intention to contract. *Lection v. Dyll*, 65 S.W.3d 696, 704 (Tex. App.-Dallas 2001, pet. denied). The consent of the physician, whether express or implied, is absolutely necessary to the creation of the relationship. *See Gross*, 149 S.W.3d at 222; *Majzoub v. Appling*, 95 S.W.3d 432, 436 (Tex.App.-Houston [1st Dist.] 2002, pet. denied). "If there is no prior relationship between the physician and the patient, there must be some affirmative action on the part of the physician to treat the patient to create such a relationship." *Gross*, 149 S.W.3d at 221–22 (quoting *Majzoub*, 95 S.W.3d at 436). "Mere recommendations, made by an on-call physician, to be accepted or rejected by a treating physician do not constitute such an affirmative act." *Majzoub*, 95 S.W.3d at 438.

## V. Case Law

Several cases have discussed the parameters of the physician-patient relationship

in similar, but not the same, circumstances as exist here. In *Majzoub*, an on-call physician was called by an emergency room doctor and told about a patient in the emergency room. 95 S.W.3d at 434–35. The on-call doctor answered questions and made certain recommendations, which were apparently followed. *Id.* Regarding this conversation, the court, in affirming a summary judgment in favor of the on-call physician based on the absence of a physician-patient relationship, observed that (1) the emergency room physician retained responsibility for the patient and was free to accept or reject the on-call physician's recommendations, (2) the on-call physician made no medical diagnosis or medical decisions, (3) nothing indicated that either doctor contemplated that the comments were binding on the emergency room doctor and (4) the on-call physician did not have the responsibility to control the patient's treatment. *Id.* at 438. The court also noted,

> The extension of potential malpractice liability to doctors with whom a treating physician has merely conferred, without more, would unacceptably inhibit the exchange of information and expertise among physicians. This would benefit neither those seeking medical attention nor the medical profession.

*Id.*

In *Lopez v. Aziz*, 852 S.W.2d 303, 304, 306–07 (Tex.App.-San Antonio 1993, no writ), a similar result occurred in a suit where a treating physician sought treatment advice over the phone from an OB–GYN, and followed the advice. The court observed that the OB–GYN, Dr. Aziz,

> did no more than answer the professional inquiry of a colleague. There is no evidence of any consensual basis for the existence of a physician-patient relationship arising out of that one telephone conversation.... To expose physicians such as Dr. Aziz to liability for simply conferring with a colleague would be detrimental in the long run to those seeking competent medical attention and is contrary to the public policy of this state.

*Id.* at 306–07. The court went on to observe that (1) Dr. Aziz did not contact, examine, or treat the patient, (2) his opinions concerning treatment were directed to her treating physician who was free to accept or reject the recommendations, and (3) the treating doctor acknowledged that he was ultimately responsible for the patient's treatment. *Id.*

A different result was reached in *Kimber v. Sideris*, 8 S.W.3d 672, 676–78 (Tex. App.-Amarillo 1999, no pet.). Dr. Sideris was Julia Kimber's pediatric cardiologist, a non-surgeon. He was present for the entire surgery of his patient and squeezed in around the surgical field to observe the surgery, and he was ousted from that position when he would do so. As to a patch being placed during the surgery, he complained at least three times that each patch was insufficient and needed to be replaced. There was evidence that he was directing some of the decisions being made during the surgery. The court found that under these circumstances, there was evidence that Dr. Sideris was more than an observer, undertook an affirmative course of action by directing some of the decisions during surgery and was hence a participant in the surgery, thereby raising a fact question as to whether Dr. Sideris assumed a duty during the surgery. *Id.* The court reversed the summary judgment in favor of the doctor and remanded the case to the trial court. *Id.*

## VI. Application

■ We hold that under the facts presented, no physician-patient relationship existed, as proven by Dr. Samuelson. Dr. Samuelson's role was that of a question

answerer, and he confirmed the thinking of Dr. Korenman. He appeared briefly in the surgical suite at the behest of Dr. Korenman, did not enter the surgical field, did not touch the patient, did not scrub-in, was not in a position to direct a procedure, did not prepare a report, never spoke to the patient, and did not bill for his time. Dr. Korenman remained responsible for the patient, and he testified that he alone made the decision to proceed with surgery and that his conversation with Dr. Samuelson was not determinative. Further, we agree with the public policy rationale expressed in *Majzoub* and *Lopez;* to hold that a physician-patient relationship could be established in these circumstances would have a chilling effect on efficient medical care and be contrary to the public policy of this state.

## VII. Conclusion

Having overruled Stutes's two issues, we affirm the judgment of the trial court.