# Supreme Court of Texas

No. 20-0802

Lake Jackson Medical Spa, Ltd., Robert Yarish, M.D., and Jamie Gutzman,

*Petitioners*,

v.

Erika Gaytan,

*Respondent*

On Petition for Review from the
Court of Appeals for the Fourteenth District of Texas

**Argued October 26, 2021**

JUSTICE BOYD delivered the opinion of the Court.

The plaintiff in this case alleges that the defendants negligently administered various treatments that caused scarring and discoloration to her skin. The primary issue is whether her claims constitute "health care liability claims" under the Texas Medical Liability Act. A preliminary issue is whether the Act prohibited the plaintiff from filing an amended petition after the Act's deadline for serving expert reports.

We hold that the Act did not prohibit the plaintiff from filing an amended petition and that her claims constitute health care liability claims. Because the plaintiff failed to timely serve an expert report, the Act requires that her claims be dismissed. We reverse the court of appeals' judgment and remand the case to the trial court for an award of attorney's fees, as the Act requires.

**I.**
**Background**

Erika Gaytan sued Lake Jackson Medical Spa, Ltd., its employee, aesthetician Jamie Gutzman, and its owner, Dr. Robert Yarish, complaining that Gutzman negligently performed various skin treatments that caused scarring and discoloration. Gaytan originally sued only the Medical Spa and Gutzman, expressly asserting claims for "medical negligence" involving an "improper and negligent course of medical treatment." She later added Dr. Yarish as a defendant in her first amended petition, alleging he negligently allowed Gutzman to administer the "medical treatments" even though he knew or should have known they were "improper and would cause physical harm."

In their original and first-amended answers, the defendants moved to limit discovery because Gaytan had not yet served them with

2

an expert report as the Texas Medical Liability Act requires. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(a), (s) (limiting discovery until claimant serves an expert report). Five months later, the defendants moved to dismiss Gaytan's claims because she still had not served an expert report. *See id.* § 74.351(b) (requiring dismissal with prejudice and attorney's-fees award if claimant fails to serve an expert report within 120 days after each defendant files an original answer).

Gaytan filed a response to the defendants' dismissal motion, arguing that the Act does not apply (and thus did not require her to serve an expert report) because she is not asserting a "health care liability claim" against any of the defendants. Instead, she argued, she complains only about "cosmetic skin treatments" she received "purely for aesthetic reasons." To support her response, Gaytan attached an affidavit in which she testified that she was not referred to the Medical Spa by a medical doctor, she sought only "cosmetic treatment" for acne and not to address any "disease, disorder or injury," she does not recall completing any medical-history or patient-consent forms, she never saw or consulted with Dr. Yarish, Dr. Yarish never examined or treated her, and the skin cream Gutzman applied was not a prescription medication.

3

Consistent with her response, Gaytan filed a second-amended petition the day before the hearing on the defendants' dismissal motion, in which she omitted all references to the Act and to "medical" treatments or negligence. Specifically, where

- she initially alleged she had given pre-suit notice "[p]ursuant to" the Medical Liability Act, she now omitted any reference to the Act;

- she initially alleged an "improper and negligent course of *medical* treatment," she now alleged an "improper and negligent course of *cosmetic* treatment";

- she initially alleged the Medical Spa "is in the business of providing surgical and non-surgical *medical treatment* to its *patients*," she now alleged it "is in the business of providing surgical and non-surgical *cosmetic improvements* to its *patrons* seeking such cosmetic improvements";

- she initially alleged she "was a *patient* at Defendant's medical spa," she now alleged she "was a *patron* at" the Medical Spa;

- she initially alleged she "underwent a course of *medical* treatment," she now alleged she "underwent a course of *cosmetic* treatment";

- she initially alleged she sustained scarring and darkening "as a result of the negligent medical treatments," she now omitted that phrase completely;

- she initially alleged she "was under Ms. Gutzman's care" to resolve skin conditions, she now alleged she

4

"was visiting Ms. Gutzman" to resolve those conditions;

▪ she initially asserted a claim for "Medical Negligence," she now asserted a claim for ordinary "Negligence";

▪ she initially alleged the Medical Spa is "in the business of providing health care," she now alleged it is "in the business of providing cosmetic services";

▪ she initially alleged the Medical Spa "owed [Gaytan] a duty of care as its *patient*," she now alleged it "owed [Gaytan] a duty of care as its *customer*"; and

▪ she initially sought damages "for medical malpractice," she now omitted that reference completely. [Emphases added.]

Several key facts Gaytan asserted in support of her claims and allegations, however, remained consistent in each of her petitions and in her affidavit. Specifically, as in her earlier petitions, she still alleged in her second-amended petition and in her affidavit that Dr. Yarish "is a medical physician who owns and operates" the Medical Spa; the "treatments" Gaytan received "included L.J. acne treatment, L.J. skin pen, L.J. phototherapy acne treatment, skin pen spot treatment, microdermabrasion, and L.J. VI peel treatment for areas on her face and back"; those treatments "left [Gaytan] with scarring and darkening on her back and face"; and the defendants' actions "fell below the applicable

5

standard" of care. Regarding specific breaches of the standard of care, Gaytan alleged—as she had in her earlier petitions—that the defendants:

a. failed "to properly evaluate [Gaytan's] skin condition and tailor cosmetic[1] treatments pursuant to established standards of dermatological care";

b. failed "to properly assess, document, and/or request [Gaytan's] medical history, including medications [Gaytan] was using at the time of the cosmetic[2] treatments";

c. performed "abrasive dermatological treatment such as VI peel on [Gaytan] while [Gaytan] was actively using a tretinoin cream";

d. failed "to properly instruct [Gaytan] to suspend use of tretinoin cream in anticipation of abrasive dermatological treatment such as VI peel";

e. recommended and prescribed "laser treatment without determining its effect on [Gaytan's] ethnic skin";

f. failed "to properly prepare [Gaytan's] ethnic skin to safely accept laser treatment";

g. failed "to properly adjust laser treatment to be safely applied to [Gaytan's] ethnic skin;" and

h. failed "to properly supervise and evaluate Ms. Gutzman's cosmetic treatments of [Gaytan's] skin conditions."

---

[1] The word "cosmetic" did not appear here in the original and first-amended petitions.

[2] The word "cosmetic" did not appear here in the original and first-amended petitions.

6

Regarding the Medical Spa and Dr. Yarish specifically, Gaytan also alleged that they failed to "use ordinary care in hiring, training and retaining" Gutzman.

The trial court denied the defendants' dismissal motion, and the defendants took an interlocutory appeal. *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(9) (authorizing interlocutory appeal from order denying dismissal under section 74.351(b)). The court of appeals affirmed, 627 S.W.3d 350 (Tex. App.—Houston [14th Dist.] 2020), and we granted the defendants' petition for review.

## II.
## Health Care Liability Claims

The Texas Medical Liability Act requires a claimant who asserts a "health care liability claim" against a "physician or health care provider" to serve on each defendant one or more expert reports describing the expert's opinions addressing the applicable standards of care, how the defendant's conduct failed to meet those standards, and how those failures caused the claimant's injury, harm, or damages. TEX. CIV. PRAC. & REM. CODE § 74.351(a), (r)(6). If a claimant fails to serve the report within 120 days after the defendant files an original answer, the trial court must dismiss the claim with prejudice and award the

7

defendant attorney's fees and costs. *Id.* § 74.351(b). Gaytan concedes she never served an expert report on any of the defendants in this case, but she argues the Act's requirements do not apply because she did not assert a "health care liability claim."

Whether a pleading asserts a health care liability claim presents a question of law courts review de novo. *Baylor Scott & White, Hillcrest Med. Ctr. v. Weems*, 575 S.W.3d 357, 363 (Tex. 2019). To answer that question, we must focus on the claim's "underlying nature . . . rather than its label." *Id.* To determine the claim's underlying nature, we must consider the "entire court record," including "the pleadings, motions and responses, and relevant evidence properly admitted." *Loaisiga v. Cerda*, 379 S.W.3d 248, 258 (Tex. 2012).

The defendants argue here, however, that the pleadings the trial court could consider did not include Gaytan's second-amended petition because she filed it after the statute's 120-day deadline for serving an expert report. So we must first determine which amended petition the trial court should have considered and then decide whether Gaytan asserted a health care liability claim.

## III.
## The Relevant Petition

Although Gaytan acknowledges that her first two petitions expressly asserted health care liability claims, she urged the trial court to deny the defendants' dismissal motion because she "filed a Second Amended Petition which properly sets forth the nature of her claims." The defendants urged the court to consider only her first-amended petition—the live pleading when the 120-day expert-report deadline passed—because "a health care liability claim cannot be recast as another cause of action in an attempt to avoid the expert report requirement." The trial court denied the dismissal motion without indicating which petition it considered. The court of appeals concluded it was proper to "focus on Gaytan's second amended petition" because courts must "focus on the underlying nature of the cause of action and are not bound by the pleadings." 627 S.W.3d at 350 (citing *Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842, 847 (Tex. 2005)). For several reasons, we agree with the court of appeals' resolution of this issue of first impression.

First, the Act's 120-day deadline expressly applies only to the serving of an expert report, and not to the filing of amended pleadings.

The defendants argue that the 120-day deadline prevents a claimant from amending pleadings because the Act requires the court to dismiss the claims if the claimant has not served an expert report by that date. According to the defendants, their statutory right to dismissal is fixed when the deadline passes, so any amended pleading filed after the deadline is irrelevant.

The question here, however, is not whether Gaytan failed to serve an expert report by the deadline, but whether the report requirement and deadline apply to her claims at all. Whether they apply depends on whether Gaytan asserted a "health care liability claim." TEX. CIV. PRAC. & REM. CODE § 74.351(a). If she didn't, the 120-day deadline is irrelevant; if she did, the deadline required her to timely serve an expert report. But the deadline does not govern the determination of whether she asserted a health care liability claim and thus the determination of whether the deadline applies.

Second, nothing else in the Act addresses pleading amendments one way or the other. The Act says nothing about whether or when a claimant can amend her pleadings, either before or after the 120-day deadline. Our rules generally permit parties to freely amend their pleadings, so long as doing so does not "operate as a surprise to the

10

opposite party." TEX. R. CIV. P. 63. Although the Act controls over any rule that conflicts with the Act's provisions, *see* TEX. CIV. PRAC. & REM. CODE § 74.002, rule 63 does not conflict with any of the Act's provisions. Because the defendants have not asserted that Gaytan's second-amended petition "operated as a surprise" to them, neither the Act nor our rules prohibited Gaytan from amending her petition in response to the defendants' dismissal motion.[3]

Third, the trial court's consideration of an amended pleading properly filed in response to a dismissal motion is consistent with the basis on which the court must determine whether the claimant has asserted a health care liability claim. In our numerous opinions addressing how courts must make that determination, we have repeatedly explained that they must consider "the underlying nature of the plaintiff's claim rather than its label" and that parties cannot alter

---

[3] *See, e.g., CHCA Woman's Hosp., L.P. v. Lidji*, 403 S.W.3d 228, 233 (Tex. 2013) (holding that a claimant's nonsuit of a health care liability claim before the 120-day deadline tolls the deadline until suit is refiled because the Act "neither expressly allows nor expressly prohibits tolling" and "construing the expert-report requirement to prohibit tolling in the event of a nonsuit would interfere with [the claimant's] absolute right to nonsuit the claims").

11

that nature "through artful pleading." *Weems*, 575 S.W.3d at 363.[4] In fact, courts making that determination are "not bound by the pleadings," *Bioderm Skin Care, LLC v. Sok*, 426 S.W.3d 753, 758 (Tex. 2014), and instead must determine the claim's true "underlying nature" by considering the "entire court record," including "the pleadings, motions and responses, and relevant evidence properly admitted." *Loaisiga*, 379 S.W.3d at 258. Whether a claim constitutes a health care liability claim depends on "the facts underlying the claim, not the form of, or artfully-phrased language in, the plaintiff's pleadings describing the facts or legal theories asserted." *Id.* at 255. As a result, claims "premised on facts

---

[4] *See also Rogers v. Bagley*, 623 S.W.3d 343, 350 (Tex. 2021) ("[W]hen considering whether claims are [health care liability claims], we focus not on how the plaintiff pleaded or labeled his claims but, rather, on whether the facts underlying the claim could support [a health care liability claim]."); *Tex. W. Oaks Hosp., LP v. Williams*, 371 S.W.3d 171, 176 (Tex. 2012) ("Causes of action that are [health care liability claims] cannot be transmuted to avoid the strictures of the medical liability statute."); *Yamada v. Friend*, 335 S.W.3d 192, 196 (Tex. 2010) ("Whether a claim is a health care liability claim depends on the underlying nature of the claim being made. . . . Artful pleading does not alter that nature."); *Marks v. St. Luke's Episcopal Hosp.*, 319 S.W.3d 658, 664 (Tex. 2010) ("[I]t is the gravamen of the claim, not the form of the pleadings, that controls this determination."); *Diversicare*, 185 S.W.3d at 847 ("To determine whether a cause of action is a health care liability claim . . . , we examine the underlying nature of the claim and are not bound by the form of the pleading."); *Garland Cmty. Hosp. v. Rose*, 156 S.W.3d 541, 543 (Tex. 2004) ("Plaintiffs cannot use artful pleading to avoid the [Act's] requirements when the essence of the suit is a health care liability claim. . . . To determine whether a cause of action falls under the [Act's] definition of a 'health care liability claim,' we examine the claim's underlying nature.").

that *could* support claims" that qualify as health care liability claims *are* health care liability claims, regardless of the pleading's specific allegations. *Id.*

Logic would dictate that the opposite must also be true: Just as a claimant cannot avoid the Act's application by artfully pleading claims for ordinary negligence or premises liability, she cannot activate the Act's application by inartfully pleading claims for "medical negligence." In both circumstances, the Act's application depends not on the labels contained within the pleading but on the facts revealing the claim's underlying nature, as found within the entire record. When those facts demonstrate that the claims fall within the Act's definition of a health care liability claim, the claimant cannot avoid the Act by "splitting claims into both health care liability claims and other types of claims such as ordinary negligence claims," *Yamada*, 335 S.W.3d at 193–94,[5]

---

[5] *See also Loaisiga*, 379 S.W.3d at 255 ("[A] claim based on one set of facts cannot be spliced or divided into both [a health care liability claim] and another type of claim."); *Lindsey v. Adler*, No. 05–12–00010–CV, 2013 WL 1456633, at *3–4 (Tex. App.—Dallas Apr. 9, 2013, no pet.) (mem. op.) ("Because [claimant's] second amended petition asserting assault and intentional infliction of emotional distress claims . . . is based on the same facts as the health care liability claims asserted in her original and first amended petitions, the record before us reflects the type of claim splitting expressly prohibited by *Yamada*."); *Med. Ctr. of Lewisville v. Slayton*, 335 S.W.3d 382, 385–86 (Tex. App.—Fort Worth 2011, no pet.) (holding amended petition asserting a

13

or by amending her pleading to "recast" her claims, *Marks*, 319 S.W.3d at 365–66. But when the facts demonstrate that the claim's underlying nature does not fall within the Act's definition, a pleading that incorrectly labels the claim as a health care liability claim is no more controlling than one that incorrectly avoids that label.

The defendants assert, however, that Gaytan's allegations in her original and first-amended petitions constitute judicial admissions that her claims are health care liability claims. A clear, deliberate, and unequivocal factual allegation made in a live pleading and not pleaded in the alternative constitutes a judicial admission that conclusively establishes the fact and bars the pleader from disputing it. *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 905 (Tex. 2000); *Hous. First Am. Sav. v. Musick*, 650 S.W.2d 764, 767 (Tex. 1983). But allegations contained in a pleading that is superseded by an amended pleading are not "conclusive and indisputable judicial admissions." *Sosa v. Cent. Power & Light*, 909 S.W.2d 893, 895 (Tex. 1995). We need not decide here whether and how a claimant may judicially admit that a claim is a health care liability claim because, even if Gaytan's prior

---

premises liability claim "reflects the type of claim splitting expressly prohibited by *Yamada*" when the claim was based on the same facts as the health care liability claim asserted in the original petition).

14

petitions contained such an admission, her second-amended petition did not.

Finally, the Act's dismissal process justifies the trial court's consideration of amended pleadings. The Act requires courts to dismiss health care liability claims only "on the motion of the affected physician or health care provider." TEX. CIV. PRAC. & REM. CODE § 74.351(b). Although the Act does not expressly mention it, the defendants do not dispute that the claimant must be afforded an opportunity to respond to such a motion.[6] The defendants do not contend, for example, that the trial court should not have considered the response and affidavit Gaytan filed to contest their dismissal motion, even though she also filed those documents after the 120-day deadline. Because the trial court's task at that point was to determine from the entire record the underlying nature of Gaytan's claims, we see no basis on which to hold that the court could consider those filings but not an amended petition in which Gaytan sought to clarify the nature of her claims. In fact, trial courts generally *must* allow claimants the opportunity to amend their pleadings before dismissing their claims unless "the petition

---

[6] *See Univ. of Tex. Med. Sch. at Hous. v. Than*, 901 S.W.2d 926, 930 (Tex. 1995) ("Due process at a minimum requires notice and an opportunity to be heard at a meaningful time and in a meaningful manner.").

15

affirmatively demonstrates that no cause of action exists or that plaintiff's recovery is barred." *Peek v. Equip. Serv. Co. of San Antonio*, 779 S.W.2d 802, 805 (Tex. 1989).

For these reasons, we hold that the Act does not prohibit trial courts from considering an amended petition filed in response to a dismissal motion under section 74.351. Except when our procedural rules prohibit such a filing, courts deciding a section 74.351 dismissal motion should consider an amended petition when determining the claims' underlying nature. Although an amended petition cannot prevent dismissal merely by "recasting" the claims through the artful use of different labels, *Diversicare*, 185 S.W.3d at 851, it nevertheless comprises part of the "entire court record" courts should consider when making that determination.

## IV.
## The Underlying Nature of Gaytan's Claims

We now turn to the question of whether Gaytan asserted health care liability claims in this case. As explained, we do so by considering the entire record, which includes Gaytan's second-amended petition,[7]

---

[7] We do not consider Gaytan's original or first-amended petitions because her second-amended petition superseded the prior petitions. *See* TEX. R. CIV. P. 65; *Bos v. Smith*, 556 S.W.3d 293, 306 (Tex. 2018) ("Amended

the defendants' dismissal motion, Gaytan's response and affidavit, and all other "relevant evidence properly admitted." *Loaisiga*, 379 S.W.3d at 258. Based on the claims' underlying nature as revealed in this record, we agree with the defendants that Gaytan asserts health care liability claims.

> The Act defines the phrase "health care liability claim" to mean
>
> a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract.

TEX. CIV. PRAC. & REM. CODE § 74.001(a)(13). As we have repeatedly observed, this definition includes three basic elements: (1) the defendant must be a physician or health care provider; (2) the claim must concern "treatment, lack of treatment, or a departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care"; and (3) the

---

pleadings supersede prior pleadings, and any claim not carried forward in an amended pleading is deemed dismissed."); *FKM P'ship, Ltd. v. Bd. of Regents of Univ. of Hous. Sys.*, 255 S.W.3d 619, 633 (Tex. 2008) ("[A]mended pleadings and their contents take the place of prior pleadings.").

17

defendant's conduct must proximately cause the claimant's injury or death. *Tex. W. Oaks*, 371 S.W.3d at 179–80.[8]

The third element is not at issue here, as Gaytan alleges that the defendants' conduct caused her injury. Regarding the first element, the Act defines "physician" to mean "an individual licensed to practice medicine in this state," TEX. CIV. PRAC. & REM. CODE § 74.001(a)(23), and defines "health care provider" to include both an "affiliate of a health care provider or physician" and an "employee . . . of a health care provider or physician acting in the course and scope of the employment," *id.* § 74.001(a)(12). Gaytan alleges and concedes that Dr. Yarish is a physician. She also alleges that Dr. Yarish "owns and operates" the Medical Spa and that Gutzman was acting within the scope of her employment with Dr. Yarish or the Medical Spa when she treated Gaytan. Under these facts, the Medical Spa (as an affiliate[9] of Dr. Yarish) and Gutzman (as an employee of Dr. Yarish or the Medical Spa)

---

[8] *See also Rogers*, 623 S.W.3d at 349; *Bioderm*, 426 S.W.3d at 758; *Loaisiga*, 379 S.W.3d at 255; *Marks*, 319 S.W.3d at 664.

[9] *See* TEX. CIV. PRAC. & REM. CODE § 74.001(a)(1) (defining "affiliate" to include an entity that is "directly or indirectly . . . controlled by . . . a specified person"), (3) (defining "control" to mean "the possession of the power to direct the management and policies of the person"); *Bioderm*, 426 S.W.3d at 758 ("Because Bioderm is an affiliate of a physician, we conclude it is a health care provider under the Medical Liability Act.").

18

are both health care providers.[10] The record thus establishes the first element of a health care liability claim.

As in most disputes over whether a claim constitutes a health care liability claim, the primary issue here involves the second element— whether Gaytan's claims concern "treatment, lack of treatment, or a departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care." *Id.* § 74.001(a)(13). The defendants contend that this element is satisfied because Gaytan's claims allege that the defendants violated accepted standards of "medical care" and "health care."[11] We agree.

The Act defines "health care" to mean "any act or treatment performed or furnished, or that should have been performed or

---

[10] The court of appeals' opinion is less than clear on this point. It first noted that the parties dispute "whether Gutzman is a health care provider," 627 S.W.3d at 350–51, and later concluded that "Gaytan did not meet with, see, or agree to be treated by a physician or health care provider," *id.* at 352. But Gaytan did meet with, see, and agree to be treated by Gutzman, an employee of the Medical Spa, and the court never explained why Gutzman or the Medical Spa would not qualify as health care providers under the Act's definitions. To the extent the court of appeals concluded that Gutzman and the Medical Spa are not health care providers, we disagree.

[11] The defendants do not rely on the definition's "safety or professional or administrative services" clause.

19

furnished, by any *health care provider* for, to, or on behalf of a *patient* during the patient's *medical* care, treatment, or confinement." *Id.* § 74.001(a)(10) (emphases added). Gaytan complains of treatment Gutzman (a health care provider) furnished to Gaytan. At issue, however, is whether Gaytan was a "patient" and whether Gutzman performed the acts as part of Gaytan's "medical" care or treatment. The Act defines "medical care" to mean "any act defined as practicing medicine under Section 151.002, Occupations Code, performed or furnished, or which should have been performed, by one licensed to practice medicine in this state for, to, or on behalf of a patient during the patient's care, treatment, or confinement." *Id.* § 74.002(a)(19).[12]

Reading the definitions of "health care" and "medical care" together clarifies that physicians provide "medical care" and health care providers provide "health care." *See Marks*, 319 S.W.3d at 662. But health care providers provide health care only when they furnish

---

[12] The Act does not define the term "treatment." We have previously acknowledged its meaning within the medical context to refer to "the care and management of a patient to combat, ameliorate, or prevent a disease, disorder, or injury." *Bioderm*, 426 S.W.3d at 757 n.5 (quoting MOSBY'S MEDICAL DICTIONARY 1880 (8th ed. 2009)). Gaytan acknowledges and alleges that Gutzman "treated" her at the Medical Spa and that her claims arise from a course of "treatment," but argues that she received only "cosmetic" treatment, as opposed to "medical" treatment.

20

treatment to a patient "during"—or as part of—a physician's provision of "medical care." TEX. CIV. PRAC. & REM. CODE § 74.001(a)(10). So for Gaytan's claims to assert departures from accepted standards of "health care," the record must establish that Gutzman treated Gaytan pursuant to a physician-patient relationship between Gaytan and Dr. Yarish,[13] and that Gutzman provided those treatments during Gaytan's medical care, treatment, or confinement. We conclude based on this record that both requirements are met.

## A. Physician-patient relationship

Gaytan argues, and the court of appeals agreed, that the record establishes that she was never a patient of Dr. Yarish. *See* 627 S.W.3d at 351. To reach this conclusion, they both rely on Gaytan's affidavit, in which she testified that she never saw or consulted with Dr. Yarish, Dr. Yarish never examined or treated her, and she does not recall providing any medical-history or patient-consent forms. According to the court of appeals, the defendants "presented no evidence to the contrary," so

---

[13] *See Tex. W. Oaks*, 371 S.W.3d at 178–81 (explaining that unlike a claim alleging breach of safety, professional-services, or administrative-services standards, a claim alleging breach of health-care or medical-care standards "must involve a patient-physician relationship").

21

Gaytan's testimony conclusively negated the existence of any physician-patient relationship. 627 S.W.3d at 351–52. We disagree.

Generally, a physician-patient relationship arises when a physician agrees to provide professional medical services to a patient and the patient agrees to accept the physician's services. *See St. John v. Pope*, 901 S.W.2d 420, 423–24 (Tex. 1995); *see also Stutes v. Samuelson*, 180 S.W.3d 750, 753 (Tex. App.—Fort Worth 2005, pet. denied) (explaining that a physician-patient relationship "is created when professional services are offered and they are accepted by another"). The relationship must be contractual, consensual, and voluntary, but it "does not require the formalities of a contract." *St. John*, 901 S.W.2d at 424.

A patient may, of course, expressly agree to accept a physician's professional services by, for example, signing a consent-to-treatment form. *See Bioderm*, 426 S.W.3d at 759 (citing evidence that claimant signed a consent-to-treatment form as proof that claimant was physician's patient); *see also Rio Grande Valley Vein Clinic, P.A. v. Guerrero*, 431 S.W.3d 64, 65 (Tex. 2014) (per curiam) (noting that claimant "completed forms for medical history, informed consent, and medical information disclosure, indicating she was a patient"). Gaytan argues, and the court of appeals agreed, that the undisputed fact that

22

she does not recall providing any such forms before receiving treatment at the Medical Spa conclusively establishes that she never consented to receive Dr. Yarish's professional services. 627 S.W.3d at 351–52. But even in the absence of any such express indication, the relationship may be implied through conduct and circumstances demonstrating the parties' agreement. *St. John*, 901 S.W.2d at 423–24; *see also Stutes*, 180 S.W.3d at 753 ("The implied contractual relationship may arise from facts and circumstances indicating there was a mutual intention to contract.").[14]

Similarly, Gaytan argues, and the court of appeals agreed, that the undisputed fact that she never saw or received treatment *from Dr. Yarish* conclusively establishes that she never consented to receive his professional services. *See* 627 S.W.3d at 351–52. But a patient need not interact directly with or have physical contact with the physician for the relationship to exist. *See St. John*, 901 S.W.2d at 424 ("The fact that a physician does not deal directly with a patient does not necessarily

---

[14] *See also Childs v. Weis*, 440 S.W.2d 104, 106–07 (Tex. Civ. App.—Dallas 1969, no writ) ("The relation of physician and patient is contractual and wholly voluntary, created by agreement, express or implied."); *Estrada v. Mijares*, 407 S.W.3d 803, 807 (Tex. App.—El Paso 2013, no pet.) ("It is only with the physician's express or implied consent that the physician-patient relationship is created.").

preclude the existence of a physician-patient relationship."); *see also Lection v. Dyll*, 65 S.W.3d 696, 704 (Tex. App.—Dallas 2001, pet. denied) ("[P]hysical contact between a doctor and patient is not necessary to create a physician-patient relationship."). In *Bioderm*, for example, we held that a claimant who received laser-hair-removal treatments from a physician-owned skin-care facility was the physician's patient even though she did not meet with the physician until after she received the treatments that allegedly burned and scarred her legs. *Bioderm*, 426 S.W.3d at 756, 759 n.9; *see Guerrero*, 431 S.W.3d at 66 ("Even if, as Guerrero now claims, a nurse performed the procedure, this does not prevent the existence of a physician-patient relationship."). What matters is the physician's express or implied agreement to provide, and the patient's express or implied agreement to accept, the physician's "professional services." *St. John*, 901 S.W.2d at 423.

We conclude that this record establishes that Dr. Yarish offered, and Gaytan agreed to receive, his professional services, and Gaytan thus became his patient. According to Gaytan, she went to the Medical Spa "to seek cosmetic skin treatments to address acne on [her] back and face." The Medical Spa, which Dr. Yarish "owns and operates," is "in the business of providing surgical and non-surgical cosmetic

24

improvements." Gaytan received treatments from Gutzman, who was an aesthetician employed at the Medical Spa. Instead of improving her skin, the treatments caused scarring and discoloration because the "Defendants"—including Dr. Yarish—failed to properly evaluate her skin's condition, assess her medical condition, instruct her to suspend use of a skin cream before the treatments, determine the effect the treatments would have on her skin, and prepare her skin for the treatments and adjust them to her skin. And Dr. Yarish in particular failed to "supervise and evaluate" the treatments and negligently hired, trained, and retained Gutzman.

These facts conclusively establish that Gaytan became Dr. Yarish's patient. By seeking treatments from an employee at a medical spa Dr. Yarish owned and operated, she necessarily sought and agreed to receive his professional services. Such services, including "nonsurgical medical cosmetic procedures," need not be performed by the physician personally, but a physician who provides them indirectly through another is ultimately responsible for the patient's safety and for ensuring that the person who provides them on the physician's behalf is appropriately trained and supervised. *See* 22 TEX. ADMIN. CODE § 193.17(d). Gaytan alleges that Dr. Yarish negligently failed in this

25

regard and seeks to hold him responsible, but in the absence of a physician-patient relationship, Dr. Yarish would have no duty to do any of the things she alleges he negligently failed to do. *See St. John*, 901 S.W.2d at 423 ("[T]he duty to treat the patient with proper professional skill flows from the consensual relationship between the patient and physician, and only when that relationship exists can there be a breach of a duty resulting in medical malpractice."). By alleging that Dr. Yarish negligently caused her injuries and seeking to hold him legally liable for that conduct, Gaytan necessarily concedes that she was Dr. Yarish's patient.

**B. Medical care or treatment**

Having concluded that the claims asserted in this case are claims made by a patient against her physician and health care providers, we must still determine whether the claims complain of "medical care or treatment" to decide whether they constitute health care liability claims. TEX. CIV. PRAC. & REM. CODE § 74.001(a)(10). Although the Act's broad definition of the phrase "health care liability claim" provides an "expansive application," it does not encompass "circumstances where the conduct of which a plaintiff complains is wholly and conclusively inconsistent with, and thus separable from, the rendition of" medical

care or health care, even when the claimant is a patient who sues her physician or health care provider. *Loaisiga*, 379 S.W.3d at 256–57.[15]

In light of the Act's broad definitions, we held in *Loaisiga* that it "essentially creates a presumption" that a patient's claim against her physician or health care provider complains of "medical care or treatment" and thus constitutes a health care liability claim if it is based on "the defendant's conduct during the patient's care, treatment, or confinement." *Loaisiga*, 379 S.W.3d at 256; *see also Weems*, 575 S.W.3d at 363; *Guerrero*, 431 S.W.3d at 65; *Bioderm*, 426 S.W.3d at 756. When—as here—the presumption applies, the burden shifts to the claimant to rebut it by showing that her claims are not based on the defendant's "departure from accepted standards of medical care or health care." *Bioderm*, 426 S.W.3d at 759–60 (quoting *Tex. W. Oaks*, 371 S.W.3d at 179–80). To decide whether the claimant has met that burden, we "first determine whether expert medical or health care testimony is needed to

---

[15] For example, a patient's "claim against a medical or health care provider for assault is not [a health care liability claim] if the record conclusively shows that (1) there is no complaint about any act of the provider related to medical or health care services other than the alleged offensive contact, (2) the alleged offensive contact was not pursuant to actual or implied consent by the plaintiff, and (3) the only possible relationship between the alleged offensive contact and the rendition of medical services or healthcare was the setting in which the act took place." *Loaisiga*, 379 S.W.3d at 257.

establish the requisite standard of care and breach." *Bioderm*, 426 S.W.3d at 760. If expert testimony is required, the claim is a health care liability claim. *Id.*[16]

### 1. The necessity of expert testimony

We held in *Bioderm* that a claimant who alleged injuries resulting from the negligent use of a laser-hair-removal device asserted health care liability claims because the device "is a regulated surgical device, which may only be acquired by a licensed medical practitioner for supervised use in her medical practice," and "the proper operation and use of this regulated surgical device requires extensive training and experience." 426 S.W.3d at 761–62. In this case, the court of appeals distinguished *Bioderm* and held that expert testimony is not required because "Gaytan has not alleged damages from the use of a medical device" or any device "that could only be acquired by a medical professional in a medical practice." 627 S.W.3d at 351–52.

---

[16] *See also Weems*, 575 S.W.3d at 366 ("The necessity of expert testimony to prove or refute the merits of a claim against a physician or health care provider is sufficient to establish that the claim is a health care liability claim."); *Guerrero*, 431 S.W.3d at 66 (holding claimant "has not rebutted this presumption because expert health care testimony is necessary to prove or refute the merits of her claim"); *Tex. W. Oaks*, 371 S.W.3d at 182 ( "[I]f expert medical or health care testimony is necessary to prove or refute the merits of the claim against a physician or health care provider, the claim is a health care liability claim.").

But we did not hold or suggest in *Bioderm* that expert testimony is required *only* when the claims are based on the use of such a device. The involvement of the device required expert testimony in *Bioderm* because the proper use of the device is "not within the common knowledge of laypersons," who "cannot be expected to understand whether" the defendant's use of the device in that case was improper. 426 S.W.3d at 761–62. The proper use of a regulated medical device, of course, is not the only topic that falls outside "the common knowledge of laypersons." *See, e.g.*, *Diversicare*, 185 S.W.3d at 851 (holding that expert testimony was required on "the ability of patients in weakened conditions to protect themselves" and "whether a potential target of an attack in a healthcare facility should be better protected and by what means" because such information "is not within the common knowledge of the general public"); *Garland Cmty. Hosp.*, 156 S.W.3d at 546 (holding that a claim that hospital negligently credentialed a physician required expert testimony because such claim "involves a specialized standard of care").

As we have explained, Gaytan alleges that Gutzman negligently administered a course of skin treatments that included "L.J. acne treatment, L.J. skin pen, L.J. phototherapy acne treatment, skin pen

29

spot treatment, microdermabrasion, and L.J. VI peel treatment." Nothing in the record establishes or suggests that the nature of and standards for the proper administration of these treatments fall "within the common knowledge of laypersons."[17]

---

[17] From what we can tell from public sources outside the record, SkinPen is an "FDA-cleared microneedling device" used for "combatting the appearance of wrinkles of the neck and facial acne scars." *SkinPen Treatment Get Started*, https://skinpen.com/skinpen-treatment-get-started/ (last visited Feb. 21, 2022); *see* 21 CFR § 878.4430(a) ("A microneedling device for aesthetic use is a device using one or more needles to mechanically puncture and injure skin tissue for aesthetic use."). SkinPen's website states that, for the patient's "safety and protection, SkinPen is available only through a physician." *SkinPen Frequently Asked Questions*, https://skinpen.com/faq-skinpen/ (last visited Feb. 21, 2022); *see* U.S. FOOD & DRUG ADMINISTRATION, DE NOVO CLASSIFICATION REQUEST FOR SKINPEN PRECISION SYSTEM, DEN160029 (2016), available at https://www.accessdata.fda.gov/cdrh_docs/reviews/DEN160029.pdf ("The sale, distribution, and use of the SkinPen Precision System is restricted to prescription use . . . .").

Phototherapy, or light therapy, involves the use of various lasers to treat acne. *See* AMERICAN ACADEMY OF DERMATOLOGY ASSOCIATION, *Laser and Lights: How Well Do They Treat Acne?*, https://www.aad.org/public/diseases/acne/derm-treat/lasers-lights (last visited Feb. 21, 2022). Some "visible-light LED devices" are FDA-approved for at-home use. *Id.* At-home lasers "are less powerful than the ones a dermatologist uses." *Id.*

Microdermabrasion involves the use of a handheld device to remove the top layer of skin to, among other things, treat acne and acne scars. *See* AMERICAN SOCIETY OF PLASTIC SURGEONS, *What is Microdermabrasion?*, https://www.plasticsurgery.org/cosmetic-procedures/microdermabrasion (last visited Feb. 21, 2022). Microdermabrasion "kits" are available for at-home use, but dermatologists perform a more intense microdermabrasion in-office. *See* AMERICAN ACADEMY OF DERMATOLOGY ASSOCIATION, *Microdermabrasion: Overview*, https://www.aad.org/public/cosmetic/age-spots-marks/microdermabrasion-overview (last visited Feb. 21, 2022).

VI Peels are "Medium-Depth" chemical peels. VITALITY INSTITUTE, *What is a Chemical Peel?*, https://vipeel.com/pages/chemical-peel (last visited Feb. 21, 2022). A chemical peel is "a cosmetic treatment used to eliminate

Moreover, Gaytan alleges that the defendants failed to "properly evaluate" her skin condition "pursuant to established standards of dermatological care," failed to "properly assess, document, and/or request" her medical history, should not have administered "abrasive dermatological treatment" when she "was actively using a tretinoin cream," should not have administered laser treatment without first determining its effect on Gaytan's "ethnic skin," failed to properly prepare her "ethnic skin to safely accept laser treatment," and failed to properly "adjust" the laser treatment so that it could be safely applied to her skin. The proper and applicable standards of "dermatological care," reliance on medical histories, risks involving the use of tretinoin cream, and proper adjustments of a laser-treatment device, as well as whether defendants' conduct fell below those standards, are all matters

wrinkles, blemishes, etc., in which an acid is applied to the face . . . causing a layer of skin to peel off." *Chemical peel*, DICTIONARY.COM, https://www.dictionary.com/browse/chemical-peel (last visited Feb. 21, 2022). "VI Peel Chemical Peel may only be purchased and administered by a medical professional." VITALITY INSTITUTE, *VI Peel*, https://vipeel.com/collections/vi-peel (last visited Feb. 21, 2022).

Of course, we have not sought to verify the accuracy or credibility of these nongovernmental resources, and we do not rely on or vouch for them here. Our point in citing them is simply to demonstrate that the determination of the nature of these and similar treatments and whether they are properly administered to any particular patient requires something other than "common knowledge."

that require expert testimony; indeed, it "would blink reality" to conclude otherwise. *Tex. W. Oaks*, 371 S.W.3d at 182.

## 2. Inseparable part of the rendition of health care

Finally, we conclude that Gaytan asserts health care liability claims even if expert testimony were not required. The necessity of expert testimony prevents the claimant from rebutting the Act's presumption, but depending on the "totality of the circumstances," a claimant might not rebut the presumption even when expert testimony is not required. *Bioderm*, 426 S.W.3d at 760.[18] In particular, we have held that a claim constitutes a health care liability claim when the conduct complained of is an "inseparable or integral part of the rendition of health care." *Tex. W. Oaks*, 371 S.W.3d at 180; *see also Diversicare*, 185 S.W.3d at 848 ("A cause of action alleges a departure from accepted standards of medical care or health care if the act or omission complained of is an inseparable part of the rendition of medical services.").

---

[18] *See also Weems*, 575 S.W.3d at 366 (holding claimant asserted health care liability claims "[e]ven if expert testimony were not ultimately required to prove his claims"); *Tex. W. Oaks*, 371 S.W.3d at 182 ("[E]ven when expert medical testimony is not necessary, the claim may still be a[ health care liability claim].").

We conclude that all of the defendants' conduct about which Gaytan complains is inseparable from the medical and health care the defendants provided. *See Marks*, 319 S.W.3d at 664 (holding the assembly and maintenance of a patient's hospital bed is "an integral and inseparable part of the health care services provided" to the patient); *Diversicare*, 185 S.W.3d at 849 (holding the supervision of a patient and another patient who assaulted her was "inseparable from the health care and nursing services provided to her"); *Garland Cmty. Hosp.*, 156 S.W.3d at 546 (holding that a hospital's conduct in credentialing a physician is "inextricably intertwined with the patient's medical treatment and the hospital's provision of health care").

Despite Gaytan's careful omission of any "medical" references in her affidavit and second-amended petition, the professional services Dr. Yarish provided to Gaytan through Gutzman and the Medical Spa involved "medical" care and treatment. *See* TEX. CIV. PRAC. & REM. CODE § 74.001(a)(10). Under Texas law, "nonsurgical medical cosmetic procedures" constitute "the practice of medicine." 22 TEX. ADMIN. CODE § 193.17(a). Physicians may delegate the provision of such services to a qualified and properly trained nonphysician if the physician ensures that certain conditions are satisfied. *See* TEX. OCC. CODE § 157.001(a)

33

(authorizing physicians to delegate "any medical act" and listing conditions for such delegations); 22 TEX. ADMIN. CODE § 193.17 (authorizing physicians to delegate "nonsurgical medical cosmetic procedures" and listing conditions for such delegations). A physician who fails to ensure that the conditions are satisfied may violate the Medical Practice Act and be liable for any resulting harm, *see* TEX. OCC. CODE § 157.001(b), but that failure does not transform the services into something other than the practice of medicine.

Texas statutes and regulations do not define "nonsurgical medical cosmetic procedures," other than to say that they include but are "not limited to the injection of medication or substances for cosmetic purposes, the administration of colonic irrigations, and the use of a prescription medical device for cosmetic purposes." 22 TEX. ADMIN. CODE § 193.17(b)(3). But the ordinary meanings of those terms would encompass the course of treatment about which Gaytan complains. Gaytan asserts that she sought the treatments for acne, and not for any "disease, disorder or injury," but acne is a disease. *See Acne*, THE AMERICAN HERITAGE STEDMAN'S MEDICAL DICTIONARY (2002) ("An inflammatory disease of the sebaceous glands and hair follicles of the skin that is marked by the eruption of pimples or pustules, especially on

34

the face.").[19] And she sought those treatments not from a beauty salon or similar establishment but from a physician-owned *medical* spa," which by definition offers medical services that must be performed or supervised by a licensed physician.[20] To the extent some of the conduct

___

[19] *See also Acne*, DICTIONARY.COM, https://www.dictionary.com/browse/acne ("[A]n inflammatory disease of the sebaceous glands, characterized by comedones and pimples, especially on the face, back, and chest, and, in severe cases, by cysts and nodules resulting in scarring.").

[20] *See* THE AMERICAN MED SPA ASSOCIATION, *Frequently Asked Questions about Medical Spas and Medical Spa Treatments*, https://www.americanmedspa.org/page/MedSpaFAQ (last visited Feb. 21, 2022) ("The American Med Spa Association defines a medical spa as a hybrid between an aesthetic medical center and a day spa[] with four core elements: (1) the provision of non-invasive (i.e. non-surgical) aesthetic medical services; (2) under the general supervision of a licensed physician; (3) performed by trained, experienced and qualified practitioners; (4) with onsite supervision by a licensed healthcare professional."); Lauren Numeroff, *Playing Doctor: The Dangerous "Medi-Spa" Game Without Rules*, 17 J.L. & POL'Y 653, 653 n.3 (2009) (quoting Juliette Fairley, *Spas With a Twist*, TIME MAG., Feb. 9, 2004, § Inside Business/Beauty, at A13) ("Medi-spas . . . differ from day spas in that they have a doctor on staff."); AMERICAN SOCIETY OF PLASTIC SURGEONS, "American Society of Plastic Surgeons Guiding Principles: Supervision of Non-Physician Personnel in Medical Spas and Physician Offices," https://www.plasticsurgery.org/Documents/Health-Policy/Principles/principle-2011-supervision-personnel-medi-spa.pdf ("The International Medical Spa Association provides the following definition of a medical spa: 'a facility that operates under the full-time, on-site supervision of a licensed health care professional. The facility operates within the scope of practices of its staff, and offers traditional, complementary, and alternative health practices and treatments in a spa-like setting. Practitioners working within a medical spa will be governed by their appropriate licensing board, if licensure is required.'"); THE AESTHETICS SOCIETY, "Putting the medical end of your medispa under the microscope," June 17, 2013, https://www.surgery.org/consumers/plastic-surgery-news-briefs/putting-medical-medispa-microscope-1051338 ("Medical spas typically offer Botox,

about which Gaytan complains did not independently constitute the provision of medical care or health care, we conclude that all of the conduct was part of and was inseparable from the "course of treatments" Gaytan sought and received. Because that course of treatment constituted the provision of medical care and health care, Gaytan has failed to rebut the presumption that her claims constitute health care liability claims under the Act.

## V.
### Disposition

We hold that the Texas Medical Liability Act's expert-report deadline did not prohibit Gaytan from amending her petition in response to the defendants' dismissal motion. But even considering her amended petition, Gaytan's claims against the defendants constitute health care liability claims subject to the Act's expert-report requirements. Because Gaytan failed to serve an expert report before the Act's 120-day deadline, her claims must be dismissed. Because the Act requires the trial court to award defendants their reasonable attorney's fees and costs, *see* TEX. CIV. PRAC. & REM. CODE § 74.351(b), we remand the case to the trial court for further proceedings.

---

facial peels, laser skin treatments and other minimally invasive cosmetic procedures.").

_____
Jeffrey S. Boyd
Justice

**OPINION DELIVERED:** February 25, 2022