**Reversed and Remanded and Memorandum Opinion filed February 2, 2023.**



In The

# Fourteenth Court of Appeals

### NO. 14-21-00060-CV

## JALARAM MED SPA, INC. D/B/A NITA MED SPA, Appellant

## V.

## PHILLIP DURBIN, Appellee

**On Appeal from the 234th District Court
Harris County, Texas
Trial Court Cause No. 2019-08409**

## MEMORANDUM OPINION

Appellant, Jalaram Med Spa, Inc. d/b/a Nita Med Spa ("Jalaram"), appeals the trial court's order denying its motion to dismiss the negligence claim filed by Appellee, Phillip Durbin. Jalaram contends that the trial court erroneously denied its motion to dismiss because Durbin failed to serve an expert report as required by the Texas Medical Liability Act (the "Act"), and it did not waive its right to seek dismissal. Jalaram also argues that it is entitled to an award of attorney's fees and court costs pursuant to the Act. We reverse and remand.

BACKGROUND

Durbin sought laser hair removal treatment at Jalaram. Before his first treatment, Durbin filled out a Client Information & Medical History and an Informed Consent for Hair Removal on March 15, 2017. The Client Information & Medical History required Durbin, among other things, to provide information about his personal history, medical history, and the medications he was taking. Durbin also certified with his signature as follows: "I certify that the preceding medical, personal and skin history statements are true and correct. I am aware that it is my responsibility to inform the technician, esthetician, therapist, doctor or nurse of my current medical or health conditions and to update this history. A current medical history is essential for the caregiver to execute appropriate treatment procedures."

The Informed Consent for Hair Removal contained, among other things, information about what problems and risks can be associated with laser hair removal; it also contained the following acknowledgement signed by Durbin: "My questions regarding the procedure have been answered satisfactorily. I understand the procedure and accept the risks. I hereby release Nita Med Spa from all liabilities associated with the above indicated procedure." On April 8, 2017, for his second laser hair removal treatment, Durbin again signed an Informed Consent for Hair Removal. That form contained the following acknowledgment signed by Durbin: "My questions regarding the procedure have been answered satisfactorily. I understand the procedure and accept the risks. I hereby release Riddhi Modi (individual) and Med Spa (facility) and Dr. White (doctor) from all liabilities associated with the above indicated procedure."

On May 6, 2017, for his third laser hair removal treatment, Durbin again signed an Informed Consent for Hair Removal, which contained the following

acknowledgement: "My questions regarding the procedure have been answered satisfactorily. I understand the procedure and accept the risks. I hereby release Riddhi Modi (individual) and Nita Med Spa (facility) and Dr. White (doctor) from all liabilities associated with the above indicated procedure." The Informed Consent for Hair Removal Durbin signed for his fourth treatment on June 3, 2017, contained the following acknowledgement: "My questions regarding the procedure have been answered satisfactorily. I understand the procedure and accept the risks. I hereby release Nita Med Spa from all liabilities associated with the above indicated procedure."

On February 1, 2019, Durbin sued Jalaram for negligence.[1] He alleged in his live pleading of May 13, 2019, among other things, as follows:

> This lawsuit has become necessary as a result of personal injuries suffered by Plaintiff on or about June 3, 2017. On that date, Plaintiff was a customer at JALARAM MED SPA, INC. D/B/A NITA MED SPA. Plaintiff sought their services for laser hair removal on his legs and the trunk of his body. While receiving his third session of treatment, the technician used a newer machine with greater intensity. After performing most of the treatment[,] he heard the technician utter "uh-oh." Not long thereafter, Plaintiff was covered with red swollen and angry looking spots in all of the areas that were treated with the laser. He was in severe pain.
>
> *        *        *
>
> Defendant, JALARAM MED SPA, INC. D/B/A NITA MED SPA was negligent at the time of Plaintiff's injury because they violated their duty owed to h[im] to exercise ordinary care, in one or more of the following ways which are stated by way of illustration and not limitation:
>
>     a.    Failing to exercise reasonable care to protect Plaintiff from severe laser burns;

---

[1] Durbin also asserted a product liability claim against Quanta Aesthetic Lasers USA, LLC and Quanta System SPA. However, these entities are not a part of the appeal before the court.

b.      Failing to conduct laser hair removal treatment in a safe, reasonable and prudent manner;

c.      Failing to train and supervise laser removal technicians in the safe and proper use of lasers; and

d.      Failing to act as a reasonable prudent person would have done under the same or similar circumstances.

Each of these acts and/or omissions, singularly or in any combination with others, constituted negligence which proximately caused the occurrences made the basis of this action and Plaintiff's injuries and damages.

On July 30, 2020, Jalaram filed a "Motion to Dismiss Plaintiff Phillip Durbin's Claim for Medical Negligence or Alternatively and Expressly Subject to its Motion to Dismiss, its Motion for Summary Judgment." On December 3, 2020, Jalaram filed its "Second Amended Motion to Dismiss Plaintiff Phillip Durbin's Claim for Medical Negligence or Alternatively and Expressly Subject to its Second Amended Motion to Dismiss, its Motion for Summary Judgment."

In its motion, Jalaram argued that it is entitled to dismissal because Durbin failed to serve a written expert report within 120 days after Jalaram filed its answer to Durbin's lawsuit as required by Texas Civil Practice and Remedies Code section 74.351(a). In that regard, Jalaram contended that "Jalaram's Laser Treatment to Plaintiff Durbin Satisfies the Three Elements of a Health Care Liability Claim Under Texas Law" because (1) Jalaram is a health care provider; (2) Durbin alleged in his live pleading that Jalaram's "acts and/or omissions, singularly or in combination with others, constituted negligence which pro[xim]ately caused the occurrence made the basis of this action and Plaintiff's injuries and damages"; and (3) the Texas Supreme Court "held that laser hair removal is a treatment directly related to health care." Jalaram also asserted that it was entitled to recover reasonable attorney's fees and costs pursuant to Texas Civil Practice and Remedies Code section 74.351(b) because of Durbin's failure to provide an expert report.

Durbin filed his response to Jalaram's motion to dismiss and motion for summary judgment on December 29, 2020. He argued that his claims are not governed by the Act because Jalaram did not provide medical treatment to him and any procedures performed by Jalaram were not performed by or supervised by any medical professional. Durbin stated that his claim is not a health care liability claim because Jalaram is not a health care provider and his claim is not for medical or health care. In that respect, he noted that Jalaram was not owned or operated by a physician and there is no documentary proof that a patient-physician relationship was ever established. Alternatively, Durbin contended that Jalaram "waived any right to file a motion to dismiss by acting contrary to any such rights for 344 days after the 120 day deadline."

On January 4, 2021, Jalaram filed a Reply in Support of its Second Amended Motion to Dismiss and Motion for Summary Judgment negating Durbin's arguments. On January 5, 2021, the trial court held a hearing on Jalaram's motion. The trial court signed an order denying Jalaram's motion to dismiss on January 7, 2021. Jalaram filed a timely notice of interlocutory appeal.[2]

## ANALYSIS

In three issues, Jalaram argues that (1) the trial court erroneously denied its motion to dismiss because Durbin failed to serve an expert report as required by the Act; (2) it did not waive its right to seek dismissal; and (3) it is entitled to an award of attorney's fees and court costs pursuant to the Act. We address each

---

[2] Generally, Texas appellate courts have jurisdiction only over final judgments. *Loaisiga v. Cerda*, 379 S.W.3d 248, 254 (Tex. 2012). However, an exception exists for certain interlocutory orders in Texas Civil Practice and Remedies Code section 51.014(a)(9), which provides in relevant part: "A person may appeal from an interlocutory order of a district court, county court at law, or county court that . . . denies all or part of the relief sought by a motion under Section 74.351(b), except that an appeal may not be taken from an order granting an extension under Section 74.351." *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(9)*; Loaisiga*, 379 S.W.3d at 254.

issue in turn.

## I.     Motion to Dismiss for Failure to File Expert Report

In its first issue, Jalaram contends that the trial court erred in denying its motion to dismiss because Durbin asserted a health care liability claim but failed to serve a written expert report as required by Texas Civil Practice and Remedies Code section 74.351(a).

### A.     Applicable Law and Standard of Review

The Act requires a claimant who asserts a "health care liability claim" against a "physician or health care provider" to serve on each defendant one or more expert reports describing the expert's opinions addressing the applicable standards of care, how the defendant's conduct failed to meet those standards, and how those failures caused the claimant's injury, harm, or damages.  Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a), (r)(6); *Lake Jackson Med. Spa, Ltd. v. Gaytan*, 640 S.W.3d 830, 836 (Tex. 2022).  If a claimant fails to serve the report within 120 days after the defendant files an original answer, the trial court must dismiss the claim with prejudice and award the defendant reasonable attorney's fees and costs. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(b); *Lake Jackson Med. Spa, Ltd.*, 640 S.W.3d at 836.  Durbin does not dispute that he never served an expert report on Jalaram in this case; instead, he argues the Act's requirements do not apply because he did not assert a "health care liability claim."

Whether Durbin asserted in his pleading a health care liability claim presents a question of law we review *de novo*.  *See Lake Jackson Med. Spa, Ltd.*, 640 S.W.3d at 836; *Baylor Scott & White, Hillcrest Med. Ctr. v. Weems*, 575 S.W.3d 357, 363 (Tex. 2019).  When construing a statute, we give it the effect intended by the Legislature.  *Bioderm Skin Care, LLC v. Sok*, 426 S.W.3d 753, 758 (Tex.

6

2014). The best expression of the legislative intent is the plain meaning of the statute's text. *Id*. at 758-59. We also consider that the broad language of the Act evinces legislative intent for the statute to have expansive application. *Loaisiga v. Cerda*, 379 S.W.3d 248, 256 (Tex. 2012). In our review, we must focus on the underlying nature of Durbin's claim rather than its label. *See Lake Jackson Med. Spa, Ltd.*, 640 S.W.3d at 836; *Baylor Scott & White, Hillcrest Med. Ctr.*, 575 S.W.3d at 363. To determine whether Durbin's claim is a health care liability claim, we must consider the "entire court record, including the pleadings, motions and responses, and relevant evidence properly admitted." *Loaisiga*, 379 S.W.3d at 256.

### B.      Health Care Liability Claim

The Act defines "health care liability claim" to mean

> a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract.

Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(13). This statutory definition contains three elements: (1) the defendant must be a health care provider or physician; (2) the claim must concern treatment, lack of treatment, or a departure from accepted standards of medical care, health care, or safety or professional or administrative services directly related to health care; and (3) the defendant's conduct must be the proximate cause of the claimant's injury or death. *Rogers v. Bagley*, 623 S.W.3d 343, 349 (Tex. 2021); *Loaisiga*, 379 S.W.3d at 255.

Here, the third element is not in dispute — Durbin alleged that Jalaram's acts and/or omissions proximately caused his injuries and damages. Instead, the

7

parties' disagreement centers around the first and second elements — the questions whether Jalaram is a health care provider and whether Durbin's claim is for medical care or health care. In answering these questions, we are mindful of the supreme court's holding that the Act "creates a rebuttable presumption that a patient's claims against a physician or health care provider based on facts implicating the defendant's conduct during the patient's care, treatment, or confinement are" health care liability claims. *Loaisiga*, 379 S.W.3d at 258; *accord Lake Jackson Med. Spa, Ltd.*, 640 S.W.3d at 844; *Bioderm Skin Care, LLC*, 426 S.W.3d at 758.

### 1. Health Care Provider

Beginning with the first element, the Act defines "physician" as "an individual licensed to practice medicine in this state." Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(23)(A). "Health care provider" is defined to mean "any person, partnership, professional association, corporation, facility, or institution duly licensed, certified, registered, or chartered by the State of Texas to provide health care, including . . . an . . . affiliate of a health care provider or physician." *Id*. § 74.001(a)(12)(A), (B). The statute provides that "'Affiliate' means a person who, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with a specified person, including any direct or indirect parent or subsidiary." *Id*. § 74.001(a)(1). Further, the Act defines "control" as "the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of the person, whether through ownership of equity or securities, by contract, or otherwise." *Id*. § 74.001(a)(3). Thus, if a physician directly or indirectly controls Jalaram, we must conclude that Jalaram is an affiliate of that physician and is a health care provider under the Act. *See Bioderm Skin Care, LLC*, 426 S.W.3d at 759.

8

The Texas Health and Safety Code provides that "[a] laser hair removal facility must have a written contract with a consulting physician to: (1) establish proper protocols for the services provided at the facility; and (2) audit the laser hair removal facility's protocols and operations." Tex. Health & Safety Code Ann. § 401.519. Therefore, a laser hair removal facility may not provide services unless a consulting physician establishes protocols for the services and supervises the operations of the facility and provision of services. *See id.*

The record shows that Dr. White was Jalaram's consulting physician per written contract at the time Durbin sought and received laser hair removal treatments from Jalaram. Dr. White was responsible for establishing proper protocols for the services Jalaram provided and the implementation of these protocols and Jalaram's operations. As part of the protocol Dr. White established, he "gave Jalaram a list of prohibited medications; these medications could not be used by clients prior to any laser treatments. Specifically, Dr. White ordered [Jalaram] not to perform laser treatments on any clients that use mood-altering medications or antidepressants. This is why [Jalaram] ask[s] [its] clients, through the Client Information & Medical History forms, if they are taking such medications prior to their laser treatments."[3]

Dr. White possessed the power to direct the management and policies of Jalaram. Thus, because Jalaram was controlled by Dr. White, we conclude that Jalaram is an affiliate of Dr. White (a physician) and is a health care provider under the Act. *See Bioderm Skin Care, LLC*, 426 S.W.3d at 758-59; *see also* Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(1), (3), (12)(B)(i).

---

[3] Evidence shows that Durbin was taking one of these prohibited medications while undergoing treatment but failed to disclose so on the Client Information & Medical History he filled out.

9

## 2.     Care or Treatment

We next turn to the second element and determine whether Durbin's claim concerns "treatment, lack of treatment, or a departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care." *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(13).   Jalaram contends that the second element is satisfied because Durbin's claim alleges that Jalaram violated accepted standards of "medical care" and "health care."  Durbin counters that Jalaram provided only grooming services and not medical care or health care as Durbin "did not meet with, see, or agree to be treated by a physician or other health care provider, but instead only sought assistance with grooming."

The Act defines "health care" as "any act or treatment performed or furnished, or that should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement." *Id.* § 74.001(a)(10).  Durbin complains of treatment Jalaram, a health care provider, provided to him.  However, the issue is whether Durbin was a "patient" and whether Jalaram performed acts as part of Durbin's "medical" care or treatment.  The Act defines "medical care" as "any act defined as practicing medicine under Section 151.002, Occupations Code, performed or furnished, or which should have been performed, by one licensed to practice medicine in this state for, to, or on behalf of a patient during the patient's care, treatment, or confinement." *Id.* § 74.001(a)(19).

"Reading the definitions of 'health care' and 'medical care' together clarifies that physicians provide 'medical care' and health care providers provide 'health care.'"  *Lake Jackson Med. Spa, Ltd.*, 640 S.W.3d at 841.  Yet, health care providers provide health care only when they furnish treatment to a patient during,

10

or as part of, a physician's provision of "medical care." *Id.*; *see also* Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(10). Treatment and a physician-patient relationship are elements of a claimed departure from accepted standards of health care.[4] *See Tex. W. Oaks Hosp., LP v. Williams*, 371 S.W.3d 171, 180-81 (Tex. 2012); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(10). Thus, for Durbin's claim to assert departures from accepted standards of "health care," the record must establish that Jalaram treated Durbin pursuant to a physician-patient relationship between Durbin and Dr. White, and that Jalaram provided those treatments during Durbin's medical care, treatment, or confinement. *See Lake Jackson Med. Spa, Ltd.*, 640 S.W.3d at 841. Based on the record before us, both of these requirements are met.

Durbin contends that he is not a patient because he "did not meet with, see, or agree to be treated by a physician" and "there is no documentary proof that a patient-physician relationship was ever established."

A physician-patient relationship generally arises when a physician agrees to provide professional medical services to a patient and the patient agrees to accept the physician's services. *Id.* at 841-42. Although the relationship must be contractual, consensual, and voluntary, "'it does not require the formalities of a contract.'" *Id.* at 842 (quoting *St. John v. Pope*, 901 S.W.2d 420 (Tex. 1995)). A patient may expressly agree to accept a physician's professional services by, for example, signing a consent-to-treatment form; but even in the absence of any such express indication, the relationship may be implied through conduct and circumstances that demonstrate the parties' agreement. *Id.* Further, a patient need

---

[4] The supreme court has previously explained that unlike a claim alleging breach of safety, professional-services, or administrative-services standards, a claim alleging breach of health-care or medical-care standards "must involve a patient-physician relationship." *Tex. W. Oaks Hosp., LP v. Williams*, 371 S.W.3d 171, 180-81 (Tex. 2012).

11

not interact directly with or have physical contact with the physician for the relationship to exist. *Id*. (citing *Bioderm Skin Care, LLC*, 426 S.W.3d at 756-57, 759 n.9) (finding that a claimant who received laser hair removal treatments from a physician-owned skin-care facility was the physician's patient even though she did not meet with the physician until after she received the treatments that allegedly burned and scarred her legs)).

Durbin completed a Client Information & Medical History in which he, among other things, provided information about his personal history, medical history, and the medications he was taking. He also completed, before each treatment, an Informed Consent for Hair Removal. The supreme court has previously held that "completed forms for medical history, informed consent, and medical information disclosure[] indicat[e] [plaintiff] was a patient." *Rio Grande Valley Vein Clinic, P.A. v. Guerrero*, 431 S.W.3d 64, 65 (Tex. 2014) (per curiam). Because Durbin completed the same forms as the plaintiff in *Rio Grande*, we also conclude that Durbin was a patient and had a physician-patient relationship. *See id*.

Additionally, Durbin's claim is based on facts implicating Jalaram's conduct during his care and treatment. He asserted that he was injured while receiving care and treatment from Jalaram, a health care provider; therefore, the rebuttable presumption that Durbin's claim is a health care liability claim applies in this case. *See Bioderm Skin Care, LLC*, 426 S.W.3d at 759; *Rio Grande Valley Vein Clinic*, 431 S.W.3d at 65; *see also Lake Jackson Med. Spa, Ltd.*, 640 S.W.3d at 843-44.

### 3. Departure from Accepted Standards of Health Care

Accordingly, we next consider whether Durbin has rebutted the presumption. If Durbin has not rebutted it, his claim must be dismissed for failure to serve an expert report as required by the Act. *See Bioderm Skin Care, LLC*, 426

12

S.W.3d at 759. We already concluded that his claim satisfies the first element of a health care liability claim because Jalaram is a health care provider; and there is no dispute that the third element of a health care liability claim (causation of the injury) is satisfied. Hence, Durbin may only rebut the presumption that his claim is a health care liability claim by proving that his claim is not based on "an alleged 'departure from accepted standards of medical care or health care.'" *See id.* at 759-60 (quoting Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(13)); *see also Lake Jackson Med. Spa, Ltd.*, 640 S.W.3d at 844.

In determining whether a claim alleges a departure from accepted standards of health care, the supreme court has "held that 'if expert medical or health care testimony is necessary to prove or refute the merits of the claim against a physician or health care provider, the claim is a health care liability claim.'" *Bioderm Skin Care, LLC*, 426 S.W.3d at 760 (quoting *Tex. W. Oaks Hosp.*, 371 S.W.3d at 182). Thus, to decide if a claim alleges a departure from accepted standards of medical or health care, we must first determine whether expert medical or health care testimony is needed to establish the requisite standard of care and breach. *See id.*; *Lake Jackson Med. Spa, Ltd.*, 640 S.W.3d at 844. "If expert testimony is required, the claim is a health care liability claim." *Lake Jackson Med. Spa, Ltd.*, 640 S.W.3d at 844.

The supreme court has previously held that a claimant, who alleged injuries resulting from the negligent use of a medical device, namely, a laser used for laser hair removal, asserted a health care liability claim because the proper use and operation of the device "requires extensive training and experience, which indicates that such matters are not within the common knowledge of laypersons." *Bioderm Skin Care, LLC*, 426 S.W.3d at 762. Laypersons cannot be expected to understand whether a defendant's use of the device is improper and falls below the

13

accepted standards of care. *See Lake Jackson Med. Spa, Ltd.*, 640 S.W.3d at 844.

Jalaram's owner, Nita Thakkar, stated in her affidavit that Riddhi H. Modi, who performed the laser hair removal treatment on Durbin, was a laser hair removal professional which apparently is the highest certification level. Thakkar described Modi's laser training and certifications in pertinent part as follows:

16. The laser technician who provide[d] the laser treatment to Mr. Durbin on June 3, 2017 was Riddhi Modi who was a laser technician licensed by the State of Texas. . . .

*     *     *

18. Ms. Riddhi H. Mod[]i also received a designation of Laser Hair Removal Professional from the Texas Department of Licensing & Registration. . . .

19. Ms. Riddhi H. Modi received her laser training from the Texas Laser Institute and received her diploma on April 24, 2016 as a Professional Laser Hair Removal Technician. . . .

20. Ms. Modi's training consisted of initially Apprentice-in-Training. After completing that level, she was then required to send all of the pertinent completed course work to the Texas Department of Licensing and Regulation. After reviewing all the paperwork Ms. Modi had sent, the Texas Department of Licensing and Regulation issued her a license for Apprentice-in-Training. The second level was becoming a Senior Technician. After receiving the license for Apprentice-in-Training, Ms. Modi went back to the Texas Laser Institute and took more classes to become a senior technician. After completing that course work[,] the paperwork was then sent to the Texas Department of Licensing and Regulation who then reviewed the paperwork and allowed her to work as a Senior Technician. After becoming a Senior Technician, Ms. Modi signed up for her final examination for Professional Technician and having passed that exam such was sent to the Texas Department of Licensing and Regulation who then issued her a license to work as a Professional Technician. . . .

The record also contains copies of Modi's license for laser hair removal professional from the Texas Department of Licensing & Regulation, certification

for professional laser hair removal technician from the Texas Laser Institute, and certificate of registration for laser hair removal senior technician from the Texas Department of Health Services.

Texas law requires a "laser hair removal apprentice-in-training" to satisfy the following in order to receive a certificate:

> (a) An applicant for a laser hair removal apprentice-in-training certificate must have at least 24 hours of training in safety, laser physics, skin typing, skin reactions, treatment protocols, burns, eye protection, emergencies, and posttreatment protocols.
>
> (b) A laser hair removal apprentice-in-training must work directly under the supervision of a senior laser hair removal technician or a certified laser hair removal professional.
>
> (c) A person must be at least 18 years of age to qualify to be a laser hair removal apprentice-in-training.

Tex. Health & Safety Code Ann. § 401.508. To receive a "laser hair removal technician" certificate, an applicant must "(1) meet the requirements for a laser hair removal apprentice-in-training certificate under Section 401.508; and (2) have performed at least 100 laser hair removal procedures under the direct supervision of a senior laser hair removal technician or a certified laser hair removal professional." *Id*. § 401.507. A certificate for a "senior laser hair removal technician" requires an applicant to "(1) meet the requirements for a laser hair removal technician certificate under Section 401.507; and (2) have supervised at least 100 laser hair removal procedures, as audited by a certified laser hair removal professional." *Id*. § 401.506. Finally, the requirements for a "certified laser hair removal professional" are as follows:

> (a) An applicant for a laser hair removal professional certificate must:
>
> > (1) be certified by a recognized certifying agency, including the Society for Clinical and Medical Hair Removal or another certification entity approved by the department;

(2) meet the requirements for a senior laser hair removal technician certificate under Section 401.506; and

(3) pass an examination required by the department.[5]

(b) A certified laser hair removal professional acting under the protocol established with a consulting physician may perform laser hair removal without supervision.

*Id*. § 401.505.

"This extensive training compels the conclusion that expert health care testimony is needed to prove or refute" Durbin's claim concerning the improper use of the device in this case. *See Bioderm Skin Care, LLC*, 426 S.W.3d at 762. Durbin alleged that he suffered severe laser burns after the fourth[6] laser treatment by Jalaram after "the technician used a newer machine with greater intensity." He did not have any injuries or problems after the previous three laser treatments. "Laypersons cannot be expected to understand whether" Jalaram should have known that use of the laser on the same areas Durbin was previously treated would cause burns when using "a newer machine with greater intensity." *See id*.

Nor could laypersons know the implications of Durbin's use of certain mood-altering medications vis-a-vis the alleged use of a device "with greater intensity." *See id*. Thakkar stated in her affidavits that "Dr. White gave Jalaram a list of prohibited medications; these medications could not be used by clients prior to any laser hair removal treatments. Specifically, Dr. White ordered us not to perform laser treatments on any clients that use mood-altering medications or antidepressants. This is why we ask our clients, through the Client Information & Medical History forms, if they are taking such medications prior to their laser

---

[5] "'Department' means the Texas Department of Licensing and Regulation." Tex. Health & Safety Code Ann. § 401.501(1-a).

[6] In his pleading, Durbin states he received his injuries while "receiving his third session of treatment" on June 3, 2017. However, the evidence indicates that Durbin received his fourth laser treatment on that date.

treatments." Thakkar also stated that if Jalaram is informed about the use of "a medication that has been deemed prohibited by Dr. White, then Jalaram does not provide any laser treatment" until such medication has been discontinued. She further averred that Durbin stated in his medical history that he is not taking "mood altering or anti-depression medication" but then acknowledged in his deposition that he was taking anti-depression medication while receiving treatments. According to Thakkar:

> Jalaram would not have provided him with any laser treatment because we were advised by [Dr. White] that those types of drugs can and do cause hypersensitivity to heat and that laser treatment can cause burning and scarring of the skin. . . . Had Mr. Durbin disclosed that he was using these medications, Jalaram would never have provided him with laser treatments. . . . Because of the risk of being burned as a result of the photosensitivity impact upon a person using depression and mood-altering drugs, such as Mr. Durbin, Jalaram would not have provided him with any laser treatment.

Additionally, Durbin alleged that Jalaram failed to (1) "exercise reasonable care to protect [him] from severe laser burns;" (2) "conduct laser hair removal treatment in a safe, reasonable and prudent manner;" (3) train and supervise laser removal technicians in the safe and proper use of lasers;" (4) and "act as a reasonable prudent person would have done under the same or similar circumstances." However, the proper and applicable standards of care to safely conduct laser hair removal, reliance on medical history, risks involving the use of anti-depressants while undergoing laser hair removal, and proper adjustments of a laser-treatment device, as well as whether Jalaram's conduct fell below those standards, are all matters that require expert testimony. *See Lake Jackson Med. Spa, Ltd.*, 640 S.W.3d at 844-45. Nothing in the record before us establishes or suggests that the standards for the proper administration of laser hair removal fall "within the common knowledge of laypersons." *See id*. at 845.

17

We thus conclude that expert health care testimony is required to prove or refute Durbin's claim, and he failed to rebut the presumption that his claim is a health care liability claim. *See id*. at 844-45, 847; *Bioderm Skin Care, LLC*, 426 S.W.3d at 762. Because Durbin's asserted claim constitutes a health care liability claim subject to the Act's expert-report requirements and Durbin failed to serve an expert report, the trial court should have dismissed his claim. Accordingly, we sustain Jalaram's first issue.

## II. Waiver of Right to Seek Dismissal

Jalaram argues in its second issue that the trial court committed error to the extent it denied Jalaram's motion to dismiss based on Durbin's argument that Jalaram waived its right to seek dismissal. As he did in the trial court, Durbin contends in his appellate brief that Jalaram "waived any right to file a motion to dismiss by acting contrary to any such right for 344 days after the 120 day deadline." In particular, Durbin takes issue with Jalaram taking his deposition after the expert report deadline and retaining an expert.

### A. Standard of Review and Applicable Law

We review a trial court's ruling on a section 74.351(b) motion to dismiss for abuse of discretion. *See Jernigan v. Langley*, 195 S.W.3d 91, 93 (Tex. 2006) (per curiam); *Alexander v. Colonnades Health Care Ctr. Ltd.*, No. 14-16-00500-CV, 2017 WL 4930885, at *3 (Tex. App.—Houston [14th Dist.] Oct. 31, 2017, no pet.) (mem. op.). We defer to the trial court's factual determinations if they are supported by evidence, but we review the trial court's legal determinations *de novo*. *Alexander*, 2017 WL 4930885, at *3. Waiver ordinarily is a question of fact; it becomes a question of law and is reviewed *de novo* when the surrounding facts and circumstances are undisputed or clearly established. *Id*.

A plaintiff alleging a health care liability claim must serve the required expert report within 120 days after the defendant files an original answer. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a). If a timely expert report is not filed, the affected defendant health care provider may file a motion to dismiss, and the court must dismiss the claim with prejudice. *Id*. § 74.351(b). Although section 74.351 does not impose a deadline for a health care provider to file a motion to dismiss, a health care provider can waive its right to seek dismissal for failure to file an expert report. *See Jernigan v. Langley*, 111 S.W.3d 153, 156-58 (Tex. 2003) (per curiam).

"Waiver is defined as 'an intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right.'" *Id*. at 156 (quoting *Sun Expl. & Prod. Co. v. Benton*, 728 S.W.2d 35, 37 (Tex. 1987)). Waiver is largely a matter of intent, and for implied waiver to be found through a party's actions, intent must be clearly demonstrated by the surrounding facts and circumstances. *Id*. "There can be no waiver of a right if the person sought to be charged with waiver says or does nothing inconsistent with an intent to rely upon such right." *Id*. "[T]he mere fact that a defendant waits to file a motion for dismissal under section [74.351] is insufficient to establish waiver unless the defendant's silence or inaction shows an intent to yield the right to dismissal." *Id*. at 157. Instead, to establish an intent to waive the right to dismissal under section 74.351, a defendant's silence or inaction must be inconsistent with the intent to rely upon the right to dismissal. *Id*. Participation in discovery is also insufficient to establish waiver because it is not inconsistent with the intent to assert the right to dismissal. *Id*.

## B. Application

Jalaram argues that it did not waive its right to seek dismissal because (1)

the supreme court held that a 600-day delay did not constitute waiver; (2) conducting discovery does not constitute waiver; (3) it only took Durbin's deposition; (4) there is no deadline to file a motion to dismiss; and (5) it is entitled to learn more about the case. Durbin counters that Jalaram's conduct has been inconsistent with an intent to assert its right to seek dismissal because "Jalaram conduct[ed] the deposition of Plaintiff 169 days after the expert report was due" and "began the process of retaining a dermatological expert 226 days after the Chapter 74 expert report deadline."

We find that the controlling case in this dispute is *Jernigan*, which we regard as not distinguishable from the present case. There, Dr. Jernigan waited 600 days after receiving expert reports to move for dismissal. *Jernigan*, 111 S.W.3d at 157. During that time, Dr. Jernigan engaged in discovery, filed a motion for summary judgment on other grounds, and amended his answer to delete references to the plaintiff's failure to follow statutory prerequisites to suit. *Id*. The supreme court concluded these actions were not inconsistent with the intent to rely upon the right to dismissal. *Id*.

Here, Jalaram filed its original answer on April 22, 2019, and its motion to dismiss on July 30, 2020. During that time, Jalaram took only Durbin's deposition, designated experts, and retained an expert. Together with its motion to dismiss, Jalaram also filed "alternatively and expressly subject to its motion to dismiss" a motion for summary judgment on other grounds. However, none of these actions, considered alone or cumulatively, is clearly inconsistent with the intent to rely on Jalaram's right to seek dismissal. Attempting to learn more about the case via discovery does not demonstrate an intent to waive the right to dismiss, nor does the filing of motions for summary judgment on other grounds. *See id*. No conventional trial on the merits had begun before dismissal was sought. *See id*.

20

Also, taking acts preparatory to trial like designating or retaining an expert does not clearly evince an intent inconsistent with the right to seek dismissal. *See Seifert v. Price*, No. 05-08-00655-CV, 2008 WL 5341045, at *2 (Tex. App.—Dallas Dec. 23, 2008, pet. denied) (mem. op.) (court found no waiver even though the defendants (1) served written discovery and responded to written discovery and discovery motions; (2) filed and argued two sets of special exceptions on claims; (3) signed multiple scheduling orders; (4) designated multiple medical experts for trial testimony; (5) took five depositions, including that of plaintiff's medical expert who prepared the expert report; (6) passed on six trial settings and agreed to specially set the seventh; (7) filed multiple dispositive motions with no mention of dismissal; (8) filed a motion to strike plaintiff's expert's trial testimony based on the Robinson/Daubert standard; and (9) waited two-and-a-half years to move for dismissal).

We note that Durbin cites *In re Sheppard*, 197 S.W.3d 798 (Tex. App.—El Paso 2006, orig. proceeding [mand. denied]), to support his contention that Jalaram waived its right to seek dismissal. We find *In re Sheppard* inapposite because, among other things, the health care providers (1) filed their motion to dismiss "1,183 days or approximately three years and three months after the expert report was filed"; (2) completed discovery; and (3) announced ready for trial. *See id.* at 801-02.

Considering the undisputed facts in this case, we determine that Jalaram did not waive its right to seek dismissal of Durbin's health care liability claim. To the extent the trial court denied Jalaram's motion to dismiss based on waiver, we conclude the trial court abused its discretion. Accordingly, we sustain Jalaram's second issue.

## III.  Attorney's Fees

21

In its third issue, Jalaram contends that because Durbin's claim must be dismissed for failure to file an expert report, it is entitled to attorney's fees and court costs under the Act.

Texas Civil Practice and Remedies Code section 74.351(b) requires a trial court to dismiss a plaintiff's health care liability claim and award a health care provider reasonable attorney's fees and costs of court incurred by the health care provider, if the plaintiff fails to serve an expert report within the prescribed time limit. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(b); *Hopebridge Hosp. Houston, L.L.C. v. Lerma*, 521 S.W.3d 830, 839 (Tex. App.—Houston [14th Dist.] 2017, no pet.).

Because we concluded that Durbin's claim was a health care liability claim subject to the expert report requirement and no report was served, the trial court erred by failing to dismiss Jalaram's claim and award it reasonable attorney's fees and costs of court. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(b); *see also Hernandez v. Ebrom*, 289 S.W.3d 316, 318 (Tex. 2009) (citing Tex. Civ. Prac. & Rem. Code Ann. § 74.351(b)) ("If a timely and sufficient report is not served, the trial court must award the provider its attorney's fees and costs and dismiss the case with prejudice."); *Hopebridge Hosp. Houston, L.L.C.*, 521 S.W.3d at 839 (same).

Accordingly, we sustain Jalaram's third issue.

## CONCLUSION

Having sustained Jalaram's issues, we reverse the trial court's order denying Jalaram's motion to dismiss and remand this cause to the trial court for rendition of

judgment dismissing Durbin's claim against Jalaram with prejudice and for a determination of reasonable attorney's fees and costs of court.[7]

/s/    Meagan Hassan
Justice

Panel consists of Justices Bourliot, Hassan, and Wilson.

---

[7] *See Kelly v. Ford*, 543 S.W.3d 383, 397 (Tex. App.—Houston [14th Dist.] 2018, pet. denied).