# IN THE SUPREME COURT OF TEXAS

════════

No. 17-0563

════════

BAYLOR SCOTT AND WHITE, HILLCREST MEDICAL CENTER, PETITIONER,

v.

RUTHEN JAMES WEEMS III, RESPONDENT

════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE SIXTH DISTRICT OF TEXAS
════════════════════════════

**Argued January 31, 2019**

JUSTICE GUZMAN delivered the opinion of the Court.

The Texas Medical Liability Act (Act) requires a claimant pursuing a "health care liability claim" to timely serve an adequate expert report.[1]  Failure to do so requires dismissal with prejudice.[2]  In this case, the claimant asserts a nurse fraudulently recorded information in a patient's medical records, but the claimant did not serve anything purporting to be an expert report.  We hold that dismissal of the lawsuit is required because this falsified-medical-records claim is a health care liability claim subject to the Act's expert-report requirements.  We therefore reverse the court of appeals' judgment and render judgment for the health care provider.

---

[1] *See* TEX. CIV. PRAC. & REM. CODE § 74.351(a) (requiring service of an adequate expert report within 120 days after the original answer is filed, absent a statutorily permitted extension).

[2] *Id.* § 74.351(b)(2).

# I. Background

Ruthen James Weems III was indicted for aggravated assault by shooting or striking Ernest Bradshaw and using or exhibiting a deadly weapon—a firearm—during the commission of the crime. Weems sued Baylor Scott and White, Hillcrest Medical Center (the Hospital) for intentional infliction of emotional distress, alleging he was indicted only because the nurse who examined Bradshaw after the incident had falsified Bradshaw's medical record by fraudulently describing Bradshaw's injury as a "point-blank" "gunshot wound" to the head.

The disputed medical record states, "EMS and patient report another individual put a gun to his head and patient pushed it away as it fired. Has two penetrating wound [sic] to left forehead." The "[i]njury mechanism" is described as a "gunshot wound" with a description of the physical exam as showing "[two] penetrating wounds to left forehead concerning for GSW [gun shot wound] with entrance and exit wound. No other signs of head trauma." The record provides a "[f]inal diagnoses" of "[a]ssault with GSW (gunshot wound)" and "[t]raumatic hematoma of forehead." The medical record notes Bradshaw was discharged after this initial examination and treatment. The record does not identify Bradshaw's alleged assailant by name or description.

In Weems's live pleadings, he alleged that, "[a]s a trained nurse, it had to have been apparent to [the nurse] at the time that the medical report was written that Ernest Bradshaw was not shot." Weems elaborated:

> 4. [T]he nurse who wrote Ernest Bradshaw's medical report knowingly, intentionally and willingly falsely reported that Bradshaw had been shot in the head.

5. The nurse . . . was fully aware at the time that the information in that medical report was being used in a criminal investigation against Weems, and that the falsity of [the nurse's] written statements would have a severe negative impact on Weems's life.

6. Upon information and belief, Plaintiff surmises that this nurse was coerced into putting this false information down by [a police officer] in an attempt to cover up an illegal entry into his motel room and an illegal search of that room and seizure of Weems's person.

7. Ernest Bradshaw did not have any injuries that were consistent with any that might have been caused by a gunshot . . . .

. . . .

9. The false medical report . . . was constructed with malicious intent and reckless disregard for truth for the primary purpose of falsely imprisoning Plaintiff Weems, ruining his reputation and keeping him incarcerated for the remainder of his life.

10. The flagrantly false information in this medical report was used . . . to charge Weems with attempted murder and his bond was set at $100,000 as a direct result of it.

. . . .

27. The actions of the nurse who wrote the fraudulent medical report were both extreme and outrageous, and because of those actions Plaintiff Weems has remained incarcerated for nearly two years to live under purposely oppressive conditions solely because of the false information that Defendant recorded in Bradshaw's medical report.

Weems further claimed that he had "made it plainly clear [to the police] that Bradshaw had not been the victim of a shooting" and that "the only evidence" supporting the allegation "was the fabricated medical report written by the nurse who worked for [the Hospital]." According to Weems, a

forensics expert subsequently examined pictures of Bradshaw's injury along with his medical record and determined it was "not possible" that Bradshaw had been shot.

The Hospital answered with a general denial, invoked the civil-liability limitations in Chapter 74 of the Texas Civil Practice and Remedies Code, and asserted various affirmative defenses. For suits involving a "health care liability claim," Chapter 74 requires the claimant to serve an adequate expert report within 120 days after the defendant's original answer has been filed.[3] Dismissal with prejudice is required if an expert report is not timely served.[4]

Weems did not serve an expert report even after the Hospital alerted him to a potential dismissal risk by prematurely filing a Chapter 74 dismissal motion. Instead, Weems took the position that Chapter 74 does not apply to his personal injury claims because they are not medical malpractice claims. Following a hearing on the Hospital's amended motion to dismiss, the trial court dismissed Weems's suit with prejudice and awarded the Hospital its attorney's fees and costs.

Weems appealed, complaining about the dismissal but not the monetary award to the Hospital. The appeal was then transferred pursuant to a docket-equalization order.[5] Applying the transferring court's precedent, as required,[6] the court of appeals reversed and remanded, holding that "claims involving alteration and fabrication of medical records are not healthcare liability claims

---

[3] *Id.* § 74.351 (setting out the expert report service requirements, deadline, and grounds for extension); *see id.* § 74.001(a)(13) (defining "health care liability claim").

[4] *Id.* § 74.351(b)(2).

[5] TEX. GOV'T CODE § 73.001.

[6] TEX. R. APP. P. 41.3.

4

and, therefore, do not trigger the expert report requirement of Section 74.351."[7] However, the court noted that a split exists in the appellate courts on that point and further opined that the transferring court's precedent had questionable vitality "[u]nder the current state of the law."[8]

We granted the Hospital's petition for review to address this issue of first impression.

## II. Discussion

The Texas Medical Liability Act's comprehensive statutory framework strikes "a careful balance between eradicating frivolous claims and preserving meritorious ones."[9] As one of its chief features, the Act imposes a threshold requirement that suits asserting health care liability claims must be supported by an expert report "before litigation gets underway."[10] The expert-report mandate is a substantive hurdle that helps ensure frivolous claims are eliminated quickly.[11] Weems did not serve anything resembling an expert report, either in name or substance; therefore, his suit must be dismissed with prejudice if he is asserting a health care liability claim.[12]

Whether a claim is a health care liability claim under the Act is a question of law we review de novo.[13] In doing so, we consider the underlying nature of the plaintiff's claim rather than its

---

[7] ___ S.W.3d ___ (Tex. App.—Texarkana 2018) (citing *Benson v. Vernon*, 303 S.W.3d 755, 759 (Tex. App.—Waco 2009, no pet.)).

[8] *Id.* at ___ & n.3.

[9] *Leland v. Brandal*, 257 S.W.3d 204, 208 (Tex. 2008).

[10] *Spectrum Healthcare Res., Inc. v. McDaniel*, 306 S.W.3d 249, 253 (Tex. 2010).

[11] *Id.*; *see also Zanchi v. Lane*, 408 S.W.3d 373, 379 (Tex. 2013).

[12] TEX. CIV. PRAC. & REM. CODE § 74.351(b)(2).

[13] *CHRISTUS Health Gulf Coast v. Carswell*, 505 S.W.3d 528, 534 (Tex. 2016).

label.[14]  Accordingly, we need not consider whether Weems's claim is for intentional infliction of emotional distress, as stated in his pleadings, or fraud, as stated in his appellate briefs.  As our precedent makes clear, a party cannot avoid Chapter 74's requirements and limitations through artful pleading.[15]

When a claim brought against a health care provider is "based on facts implicating the defendant's conduct during the course of a patient's care, treatment, or confinement," a rebuttable presumption arises that it is a health care liability claim for purposes of the Medical Liability Act.[16] Weems's pleadings invoke the presumption here.  As recounted in his amended petition, the claim that Bradshaw's medical records were falsified is based on a nurse's alleged conduct during the course of a patient's care and treatment.  Weems therefore bears the burden of rebutting the presumption that his claim is a health care liability claim.  He has not done so.

## A. Health Care Liability Claim

The Medical Liability Act defines a health care liability claim as:

> a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract.[17]

---

[14] *Id.*

[15] *Garland Cmty. Hosp. v. Rose*, 156 S.W.3d 541, 543 (Tex. 2004); *Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842, 854 (Tex. 2005).

[16] *Loaisiga v. Cerda*, 379 S.W.3d 248, 256 (Tex. 2012).

[17] TEX. CIV. PRAC. & REM. CODE § 74.001(a)(13).

Weems does not dispute that the Hospital and the nurse are health care providers.[18] And if Weems is asserting a health care liability claim, then he is a "claimant" even though he was not the patient or the patient's representative.[19]

At issue here is the nature of Weems's "cause of action," an undefined phrase that refers to the "'fact or facts entitling one to institute and maintain an action, which must be alleged and proved in order to obtain relief.'"[20] Our inquiry focuses on whether the gravamen of Weems's complaint is a "claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care."[21] And, at minimum, Weems's record-falsification claim is premised on an alleged departure from accepted standards of "professional or administrative services directly related to health care." Moreover, Weems's claims, if true, satisfy the final element of a health care liability claim, because the central thesis of his claim

---

[18] *Id.* § 74.001(a)(12) (defining "health care provider" as including a registered nurse, a "health care institution," and any "employee, independent contractor, or agent of a health care provider or physician acting in the course and scope of the employment or contractual relationship"); *see id.* § 74.001(a)(11) (a "health care institution" includes a "hospital" and a "hospital system").

[19] *Id.* § 74.001(a)(2) ("'Claimant' means a person . . . seeking or who has sought recovery of damages in a health care liability claim."); *CHRISTUS Health*, 505 S.W.3d at 537 ("The Act does not limit its reach to persons receiving or having received health or medical care—it applies to 'claimants.'"); *Tex. W. Oaks Hosp., LP v. Williams*, 371 S.W.3d 171, 174 (Tex. 2012) ("[T]he [Act] does not require that the claimant be a patient of the health care provider for his claims to fall under the Act, so long as the Act's other requirements are met."); *see also Psychiatric Sols., Inc. v. Palit*, 414 S.W.3d 724, 725 (Tex. 2013).

[20] *In re Jorden*, 249 S.W.3d 416, 421 (Tex. 2008) (quoting *A.H. Belo Corp. v. Blanton*, 129 S.W.2d 619, 621 (Tex. 1939)).

[21] TEX. CIV. PRAC. & REM. CODE § 74.001(a)(13); *CHRISTUS Health*, 505 S.W.3d at 534 (determining whether a claim is a health care liability claim requires examination of "the underlying nature and gravamen of the claim, rather than the way it is pleaded").

7

is that the purported falsification proximately caused the injuries he—the claimant—alleges he has suffered.[22]

## 1. Professional or Administrative Services

The Act defines "professional or administrative services" as "those duties or services that a physician or health care provider is required to provide as a condition of maintaining the physician's or health care provider's license, accreditation status, or certification to participate in state or federal health care programs."[23] The maintenance of accurate medical records falls within this definition.

The Department of State Health Services's hospital-licensing regulations require hospitals to "have a medical record service" and maintain a "medical record . . . for every individual who presents to the hospital for evaluation or treatment."[24] This record "shall contain information to . . . support the diagnosis" and must be "accurately written."[25] The hospital must also "employ or contract with adequate personnel to ensure prompt completion" of the records.[26] The Department

---

[22] Weems does not suggest that bodily injury is required to meet the statutory definition, and we conclude in any event that it is not. The Medical Liability Act applies regardless of "whether the claimant's claim or cause of action sounds in tort or contract," and the injury requirement is not textually limited to bodily or physical injuries. TEX. CIV. PRAC. & REM. CODE § 74.001(a)(13). Moreover, the Act's singular reference to "bodily injury" is a sentence in the definition of "claimant" that does not limit its application to bodily injury claims, but rather uses the term as a condition that triggers a specific consequence. *See id.* § 74.001(a)(12) ("All persons claiming to have sustained damages as the result of the bodily injury or death of a single person are considered a single claimant."). "When the Legislature uses a word or phrase in one portion of a statute but excludes it from another, the term should not be implied where it has been excluded." *R.R. Comm'n of Tex. v. Tex. Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 628 (Tex. 2011).

[23] TEX. CIV. PRAC. & REM. CODE § 74.001(a)(24).

[24] 25 TEX. ADMIN. CODE § 133.41(j).

[25] *Id.* § 133.41(j)(4).

[26] *Id.* § 133.41(j)(1).

8

of State Health Services "may deny, suspend, or revoke a license [of a hospital] or impose an administrative penalty if the licensee or applicant . . . fails to comply" with these provisions.[27]

The Texas Medical Board may also revoke a physician's license for "violating . . . a lawful order or rule of the board."[28] The Board rules require licensed physicians to "maintain an adequate medical record for each patient that is complete, contemporaneous and legible," and to be adequate, a record that includes an "assessment, clinical impression, or diagnosis" must be "accurate."[29] Thus, accurately recording diagnoses, among other things, is a service health care providers and physicians must provide as a condition of maintaining their respective licenses.

### 2. Directly Related to Health Care

The duty to maintain accurate medical records is also directly related to health care. "Directly related" means "an uninterrupted, close relationship or link between the things being considered."[30] "Health care" is "any act or treatment performed or furnished, or that should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement."[31]

The maintenance of health records has a manifestly close relationship with the treatment of a patient—here, Weems's alleged victim. A patient's medical records must be created during the

---

[27] *Id.* § 133.121(1), (1)(B).

[28] 22 TEX. ADMIN. CODE § 160.20(5).

[29] *Id.* § 165.1(a), (a)(1)(B), (a)(10).

[30] *CHRISTUS Health Gulf Coast v. Carswell*, 505 S.W.3d 528, 536 (Tex. 2016).

[31] TEX. CIV. PRAC. & REM. CODE § 74.001(a)(10).

9

patient's care and "must contain accurate data and information pertaining to the patient based on actual findings, assessments, evaluations, diagnostics or assessments as documented by the physician."[32] Future treatment of a patient is based on medical history, including past and present diagnoses. Accordingly, the regulations governing physicians provide that "[p]ast and present diagnoses should be accessible to treating and/or consulting physicians."[33] The requirement that diagnoses be available to other physicians necessarily presupposes their accuracy. The creation and maintenance of accurate health records is thus a professional or administrative service directly related to health care.[34]

Expert testimony may or may not be required to prove that Bradshaw did not actually sustain a gunshot wound to the head. An expert would, however, be required to establish Weems's allegation, that "[a]s a trained nurse, it had to have been apparent to [the nurse] at the time that the medical report was written that Ernest Bradshaw was not shot." The necessity of expert testimony to prove or refute the merits of a claim against a physician or health care provider is sufficient to establish that the claim is a health care liability claim.[35]

---

[32] 22 TEX. ADMIN. CODE § 165.1(a), (a)(10).

[33] *Id.* § 165.1(a)(2).

[34] *TTHR, L.P. v. Coffman*, 338 S.W.3d 103, 109 (Tex. App—Fort Worth 2011, no pet.) ("There can be no 'administrative service' more directly related to the rendition of health care than the memorialization of that care.").

[35] *Tex. W. Oaks Hosp. v. Williams*, 371 S.W.3d 171, 182 (Tex. 2012).

10

Even if expert testimony were not ultimately required to prove his claims,[36] the gist of Weems's complaint is that Bradshaw's medical record was, in fact, inaccurate, which is contrary to accepted standards of care. This is a health care liability claim even though Weems does not specifically allege a departure from the standard of care.[37] Moreover, even though Weems alleges the nurse's actions were intentional, the statutory definition of a health care liability claim does not distinguish between departures that are intentional or merely negligent.[38]

Considering the nature of Weems's claims, he has asserted a health care liability claim and was therefore required to file an expert report.[39] In holding to the contrary, the court of appeals relied on *Benson v. Vernon*, which summarily concluded that "alteration and fabrication of medical

---

[36] Even when medical testimony is not necessary, the claim may still be a health care liability claim:

[The expert report requirement] does not establish a requirement for recovery. It may be that once discovery is complete and the case is tried, there is no need for expert testimony . . . . But the Legislature envisioned that discovery . . . should not go forward unless at least one expert has examined the case . . . . The fact that in the final analysis, expert testimony may not be necessary to support a verdict does not mean the claim is not a health care liability claim.

*Murphy v. Russell*, 167 S.W.3d 835, 838 (Tex. 2005).

[37] *Loaisiga v. Cerda*, 379 S.W.3d 248, 255 (Tex. 2012) ("[C]laims premised on facts that *could* support claims against a physician or health care provider for departures from accepted standards of medical care, health care, or safety or professional or administrative services directly related to health care are [health care liability claims], regardless of whether the plaintiff alleges the defendant is liable for breach of any of those standards.").

[38] *See* TEX. CIV. PRAC. & REM. CODE § 74.001(a)(13); *see also Fort Duncan Med. Ctr., L.P. v. Martin*, No. 04-11-00897-CV, 2012 WL 3104527, at *1-3 (Tex. App.—San Antonio 2012, no pet.) (mem. op.) (finding health care liability claims when the plaintiffs alleged a surgeon falsified a medical report to gain an advantage in malpractice litigation).

[39] This case does not involve allegations of fraudulent billing or medical records fabricated without an actual nexus between a patient and the provision of health or medical care. Accordingly, we need not and do not consider whether such claims would be health care liability claims under Chapter 74.

11

records . . . is not a health care liability claim required to be addressed in an expert report."[40] We disapprove *Benson* to the extent it is contrary to our holding today.

## B. Motion for Leave to File Supplemental Documents

On appeal to this Court and before pro bono counsel made an appearance, Weems filed a *pro se* motion for leave to file supplemental documents. In his motion, he claims the supplemental documents would support his factual claim that Bradshaw was not shot. His merits briefing does not, however, rest his arguments on the resolution of this factual dispute. Nor does our decision rest on assuming an answer one way or the other.

More importantly, "[w]hile the record may be supplemented under the appellate rules if something has been omitted, the supplementation rules cannot be used to create new evidence."[41] Evidence of the sort Weems asks us to consider must have been admitted at the trial court. Because the evidence is new, we deny the motion to supplement.

## III. Conclusion

Weems's claim that he was injured by a health care provider's falsification of a patient's medical records during the course of medical treatment alleges, in substance, a departure of accepted standards of professional or administrative services directly related to health care. His cause of action is, therefore, a health care liability claim. Under the Texas Medical Liability Act, Weems's

---

[40] 303 S.W.3d 755, 759 (Tex. 2009).

[41] *Whitehead v. State*, 130 S.W.3d 866, 872 (Tex. Crim. App. 2004) (citing TEX. R. APP. P. 34.5(c), 34.6(d)); *see Chambers v. State*, 194 S.W.2d 774, 775 (Tex. Crim. App. 1946) (holding documents that "have neither been filed nor introduced upon the trial . . . cannot [be] consider[ed] . . . as part of this record").

failure to timely serve an expert report necessitates dismissal with prejudice. Accordingly, we reverse the court of appeals' contrary judgment and render judgment in the Hospital's favor.

_____

Eva M. Guzman
Justice

**OPINION DELIVERED**:  April 26, 2019