# Supreme Court of Texas

---

No. 23-0317

---

Maurice N. Leibman, M.D.,

*Petitioner*,

v.

Cleveratta Waldroup and James Waldroup, Individually and as
Next Friends of R.W., a Minor,

*Respondents*

---

On Petition for Review from the
Court of Appeals for the First District of Texas

---

**Argued December 5, 2024**

JUSTICE BUSBY delivered the opinion of the Court, in which Justice Lehrmann, Justice Boyd, Justice Devine, and Justice Young joined.

JUSTICE HUDDLE filed a dissenting opinion, in which Chief Justice Blacklock, Justice Bland, and Justice Sullivan joined.

In this tragic case, a service dog attacked a young child in a restaurant. Her parents sued, among other defendants, a medical doctor who had written letters for the dog's owner saying that her service animals help with her anxiety disorder. The parents do not dispute the

correctness of the doctor's opinions that *the owner*—his patient—had a medical disorder that the dog helped treat. Instead, the parents contend the doctor was negligent because he failed to ascertain whether *the dog* (which was registered with an unrelated company) was in fact a service animal appropriately trained to behave in public. They also allege this failure proximately caused their daughter's injuries by enabling the owner to present the dog as a service animal that could enter the restaurant.

The question before us is not whether the parents' claims against the doctor have merit. Instead, it is whether the claims must be dismissed regardless of their merit because the parents failed to serve a preliminary report from a medical expert addressing the doctor's failure to evaluate the dog's temperament with non-patients. We conclude that because any such failure did not involve a "claimed departure from accepted standards of medical care" that are "applicable" here, this is not a health care liability claim for which an expert report was required. TEX. CIV. PRAC. & REM. CODE §§ 74.001(a)(13), 74.351(a), (r)(6). Because the trial court and court of appeals reached the same conclusion, we affirm.

## BACKGROUND

Three-year-old R.W. entered the Loose Caboose restaurant in Spring, Texas, with her parents, respondents Cleveratta and James Waldroup. There they encountered Kingston, a dog belonging to Jennifer Romano that was wearing a "Service Animal" vest. The Waldroups allege that Kingston attacked R.W. without provocation, biting her cheek and injuring her severely.

2

The Waldroups sued Romano and her companion, the company that owns the restaurant, and—as relevant here—Romano's former doctor, petitioner Maurice Leibman, M.D. The record indicates that Dr. Leibman, a board-certified gynecologist, provided multiple letters for Romano indicating that her "service animals" help manage her medical condition—generalized anxiety disorder. The Waldroups alleged claims of negligence and aiding and abetting against Dr. Leibman, asserting that he negligently and/or fraudulently issued the letters because he failed to take "steps" to determine "whether Kingston was actually a service animal," and that his failure "proximately caused, aided and abetted, or contributed to the incident."

Following discovery, Dr. Leibman filed a motion to dismiss, contending the claims against him are health care liability claims (HCLCs) for which an expert report was not timely served. *Id.* § 74.351(a), (b). The Waldroups responded, arguing they alleged ordinary—rather than medical—negligence because the claim is based upon Dr. Leibman "offering his unqualified and non-medical opinion regarding Kingston's behaviors."

The trial court denied Dr. Leibman's motion to dismiss, and he filed an interlocutory appeal. *See id.* § 51.014(a)(9). The court of appeals affirmed, concluding that because the tortious conduct alleged by the Waldroups did not concern "Dr. Leibman's diagnosis of [Romano] with generalized anxiety disorder, or his judgment that she may benefit from her service animals," the claims are "not inseparable from the rendition of health care" and thus do not constitute HCLCs requiring an expert

report. 699 S.W.3d 20, 29 (Tex. App.—Houston [1st Dist.] 2023) (internal quotation marks omitted).

Dr. Leibman filed a petition for review by this Court, which we granted. At oral argument, we requested supplemental briefing regarding the Waldroups' standing to bring their claim against Dr. Leibman.

## ANALYSIS

### I. The Waldroups have standing to sue Dr. Leibman.

Before turning to the merits, we must first ensure that we have jurisdiction to do so. "A court has no jurisdiction over a claim made by a plaintiff who lacks standing to assert it." *Heckman v. Williamson County*, 369 S.W.3d 137, 150 (Tex. 2012). "[W]hen a Texas appellate court reviews the standing of a party sua sponte," as we do here, "it must construe the petition in favor of the party, and if necessary, review the entire record to determine if any evidence supports standing." *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993). In this case, the parties have filed supplemental briefs addressing the Waldroups' standing, especially whether the injury alleged by the Waldroups was traceable to Dr. Leibman's conduct. Based on our review of the record and the supplemental briefing, we conclude that although the question is close, the Waldroups have standing.

The standing requirement applies in all civil litigation, including in suits between private parties. *See, e.g.*, *USAA Cas. Ins. Co. v. Letot*, 690 S.W.3d 274, 280 (Tex. 2024) (claims included conversion and tortious interference with existing and prospective contractual relations); *Linegar v. DLA Piper LLP (US)*, 495 S.W.3d 276, 282 (Tex.

4

2016) (legal malpractice and negligent misrepresentation); *DaimlerChrysler Corp. v. Inman*, 252 S.W.3d 299, 304-05 (Tex. 2008) (negligence and negligent misrepresentation); *Allstate Indem. Co. v. Forth*, 204 S.W.3d 795 (Tex. 2006) (breach of contract); *Douglas v. Delp*, 987 S.W.2d 879, 882 (Tex. 1999) (legal malpractice). "Because standing is a jurisdictional requirement, the lack of standing may be raised by the court or parties at any time." *Tex. Right to Life v. Van Stean*, 702 S.W.3d 348, 352 (Tex. 2024) (citing *Tex. Ass'n of Bus.*, 852 S.W.2d at 445-46). "Indeed, it would 'violate constitutional principles' for 'appellate courts to address the merits of cases without regard to whether the courts have jurisdiction.'" *Id.* (quoting *Rusk State Hosp. v. Black*, 392 S.W.3d 88, 95 (Tex. 2012)).

As is now familiar, standing requires a concrete injury in fact that is "fairly traceable" to the defendant's alleged conduct that a favorable judicial decision would redress. *Heckman*, 369 S.W.3d at 154-55 (discussing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). The injury and redressability requirements are readily satisfied here. The harm imposed on the Waldroups' small daughter, R.W., by Kingston's attack is unquestionably the sort of injury that a tort suit can redress by the award of money damages. *See, e.g.*, *Horizon Health Corp. v. Acadia Healthcare Co.*, 520 S.W.3d 848, 873 (Tex. 2017) (noting that "compensatory damages redress concrete losses caused by the defendant's wrongful conduct").

The traceability requirement, in contrast, is less clearly shown. To demonstrate traceability, a plaintiff must show "a causal connection between the injury and the conduct complained of." *Heckman*, 369

S.W.3d at 154. To have standing here, therefore, the injury must be fairly traceable to *Dr. Leibman's* alleged conduct: writing letters on Romano's behalf regarding her animals, including Kingston.

The connection between the dog attack and the doctor's letters, which were written a year (or more) earlier, is somewhat tenuous. The Waldroups allege that, at Romano's request, Dr. Leibman wrote the letters at issue to help prevent her "eviction" from her apartment. Moreover, the Waldroups do not allege that Romano showed Dr. Leibman's letters to the restaurant staff to gain admittance, and in fact allege that the restaurant staff made no attempt to verify whether Kingston was a service animal. The Waldroups also expressly deny that they are tracing their injuries to Dr. Leibman's diagnosis of Romano's disorder or his statements about the efficacy of service animals in treating her condition. But at this stage, the Waldroups do not need to prove that the letters caused the dog attack, which implicates the causation element of the tort claim—one that is not before us today even once we clear the jurisdictional hurdle. Instead, traceability merely requires that they reasonably trace the injury back to the allegedly improper provision of the letters, such that those letters contributed in some non-speculative way to the attack.

We narrowly conclude that, at this stage of the case, the Waldroups sufficiently alleged R.W.'s injuries were "fairly traceable" to Dr. Leibman's letters. *See Lujan*, 504 U.S. at 561 ("At the pleadings stage, general factual allegations of injury resulting from the defendant's conduct may suffice . . . ."). The Waldroups' live pleading alleges the following: (1) Kingston was in the restaurant where, "[i]n

6

accordance with Texas state law, animals are not allowed . . . with the sole exception of 'service animals' pursuant to state and federal law"; (2) Dr. Leibman "prepared multiple letters" for Romano that "enabl[ed] her to present Kingston as a 'service animal'"; (3) Kingston was "wearing a vest saying 'Service Dog'" at the time of the incident; and (4) Dr. Leibman "took no steps to ascertain whether Kingston was actually a service animal." Summarizing, the Waldroups allege that "Dr. Leibman's misrepresentations, intended to be conveyed to the public in order to permit Romano to represent Kingston as a 'service animal', proximately caused, aided and abetted, or contributed to the incident that caused the [Waldroups'] injuries."

Although the Waldroups do not specifically allege that Kingston would not have been in the restaurant *but for* Dr. Leibman's conduct, such an allegation is not required for standing. What is required are allegations that permit a reasonable inference that Dr. Leibman's letters characterizing Kingston as a service animal contributed to Romano's decision to take him into the restaurant where he injured R.W. *See Mosaic Baybrook One, L.P. v. Simien*, 674 S.W.3d 234, 251 (Tex. 2023) (holding plaintiff had standing because his "allegations allow for a reasonable inference that the alleged pocketbook injury was fairly traceable in part" to defendants' actions). We interpret the allegations to assert that the letters emboldened Romano to take greater risks with Kingston, and that without the letters she would have been less likely to bring Kingston into public spaces like the restaurant. This assertion is sufficient for purposes of traceability at the pleadings stage.

Our conclusion is reinforced by Dr. Leibman's own understanding of the Waldroups' theory. True, he now contests their standing. But in the trial court, he described their theory in the following way: that "Romano could not and/or would not have gotten a service dog vest, put it on the dog Kingston, and taken the dog to the Loose Caboose Restaurant in 2021 but for" Dr. Leibman's letters. Given that understanding, Romano's conduct of holding Kingston out to the public as a service animal was not an unpredictable response to the alleged actions of Dr. Leibman. *See Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019) (holding that the respondents had "met their burden of showing that third parties will likely react in predictable ways" to the petitioners' actions and therefore established standing).

To be clear, we are not relying on a "concession" of standing by Dr. Leibman; parties cannot confer jurisdiction by agreement, after all, nor can they "concede" jurisdiction if it is lacking. Rather, the fact that Dr. Leibman could understand the allegations against him as tracing the injury to his letters illustrates that our interpretation of the allegations does not go beyond permissible bounds. Instead, we have reached our conclusion about standing by resolving every doubt in favor of the Waldroups. *See Tex. Ass'n of Bus.*, 852 S.W.2d at 446.

We express no opinion as to whether the Waldroups can *prove* any causal connection and the other requirements for a court to render judgment in their favor. We conclude only that, at this point, the Waldroups' pleadings are sufficient to establish their standing to pursue these claims. Having discharged our duty to determine whether there

8

is standing whenever it is "not readily apparent," *id.* at 443, we now consider whether an expert report was required.

## II. The Waldroups' claims against Dr. Leibman are not health care liability claims.

The Texas Medical Liability Act—codified in Chapter 74 of the Civil Practice and Remedies Code—is a statutory framework intended to "reduce excessive frequency and severity" of medical tort claims without "unduly restrict[ing] a claimant's rights." *Leland v. Brandal*, 257 S.W.3d 204, 208 (Tex. 2008) (quoting Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.11(b)(1), (3), 2003 Tex. Gen. Laws 847, 884). To that end, the Act strikes "a careful balance between eradicating frivolous claims and preserving meritorious ones" by distinguishing ordinary tort claims from statutorily defined HCLCs and imposing additional requirements upon plaintiffs asserting the latter. *Baylor Scott & White, Hillcrest Med. Ctr. v. Weems*, 575 S.W.3d 357, 362-63 (Tex. 2019) (quoting *Leland*, 257 S.W.3d at 208).

Under the Act, an HCLC includes "a cause of action against a . . . physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care . . . which proximately results in injury to or death of a claimant." TEX. CIV. PRAC. & REM. CODE § 74.001(a)(13).[1] If the cause of action is an HCLC, the Act requires the

---

[1] Dr. Leibman argues, and the dissent observes, that a health care provider's claimed departure from health care standards is also an HCLC. *Post* at 3. But "physicians provide 'medical care' and health care providers provide 'health care.'" *Lake Jackson Med. Spa, Ltd. v. Gaytan*, 640 S.W.3d 830, 841 (Tex. 2022). Because this case involves a cause of action against a physician, we do not consider the health care aspect of the HCLC definition.

claimant "to serve one or more expert reports describing the applicable standards of care, how the defendant's conduct failed to meet those standards, and how those failures caused the claimant harm." *Collin Creek Assisted Living Ctr., Inc. v. Faber*, 671 S.W.3d 879, 885 (Tex. 2023) (citing TEX. CIV. PRAC. & REM. CODE § 74.351(a), (r)(6)). This expert-report requirement enables trial courts to "identify and eliminate frivolous [HCLC]s expeditiously, while preserving those of potential merit," *Samlowski v. Wooten*, 332 S.W.3d 404, 410 (Tex. 2011), because any claim that constitutes an HCLC is subject to dismissal with prejudice if the claimant fails to produce a sufficient expert report within the statutorily imposed timeframe, *see* TEX. CIV. PRAC. & REM. CODE § 74.351(a)-(c).

Whether the claims asserted by the Waldroups are HCLCs is a question we review de novo, looking to "the facts underlying the claim[s]" instead of their labels. *Loaisiga v. Cerda*, 379 S.W.3d 248, 254-55 (Tex. 2012). This inquiry focuses on the "operative facts underlying the claim[s] that are relevant to the alleged injury" as revealed by the pleadings and the record. *Collin Creek*, 671 S.W.3d at 885-86 (internal quotation marks omitted).

The Waldroups contend their claims are not HCLCs because they are not based on any "claimed departure from accepted standards of medical care" that are "applicable" here. TEX. CIV. PRAC. & REM. CODE §§ 74.001(a)(13), 74.351(r)(6). "Medical care" includes "any act" of "diagnosis" or "treatment" of "a mental or physical disease or disorder" that is "performed or furnished" by a licensed medical practitioner "for, to, or on behalf of a patient during the patient's care [or] treatment." *Id.*

10

§ 74.001(a)(19); TEX. OCC. CODE § 151.002(a)(13). "[I]f expert medical or health care testimony is necessary to prove or refute the merits of the claim against a physician . . . , the claim is a health care liability claim." *Tex. W. Oaks Hosp., LP v. Williams*, 371 S.W.3d 171, 182 (Tex. 2012). Accordingly, we must first decide whether a medical expert is "needed to establish the requisite standard of care," its breach, and causation. *Bioderm Skin Care, LLC v. Sok*, 426 S.W.3d 753, 760 (Tex. 2014); *see also Lake Jackson Med. Spa, Ltd. v. Gaytan*, 640 S.W.3d 830, 844 (Tex. 2022). If expert testimony is not necessary, we consider "the totality of the circumstances" to decide whether the Act applies. *Bioderm*, 426 S.W.3d at 760.

We begin, therefore, by examining what the Waldroups allege and what the record shows regarding the standard of care, breach, and causation. According to their petition, Dr. Leibman "provided a letter to [his patient Romano] solely at her request for the purpose of avoiding eviction from her apartment, stating that she required her 'service animals' on the basis of her 'generalized anxiety disorder.'" The letters, portions of which are quoted in the record,[2] include statements that she has the disorder, that "having her service animals helps with this disorder," that she "needs" Kingston—a dog that "walks into every entrance before her"—"to control her anxiety and perform her daily duties," and that her animals are "certified to be with her."

---

[2] Only one of the seven letters is in the record; the Waldroups rely on brief summaries of the other six letters prepared by the Harris County Sheriff's Office.

11

The parents further allege that Dr. Leibman "took no steps to ascertain whether Kingston was actually a service animal, trained to assist her with a disability by performing specific works or tasks." Thus, Dr. Leibman "was negligent and/or fraudulent in his provision of such letters for [his patient], enabling her to present [the dog] as a 'service animal' . . . without reasonable justification," and these "misrepresentations . . . intended to be conveyed to the public . . . proximately caused . . . the incident."

No party asserts that medical expert testimony would have any relevance to this causation theory. Indeed, the Waldroups do not allege that Romano showed Dr. Leibman's letters to the restaurant staff to gain admittance for Kingston; rather, they allege the restaurant staff made no attempt to verify whether Kingston was a service animal.

Nor is medical expert testimony needed to prove or refute an applicable standard of medical care or its breach. Dr. Leibman asserts that only a physician expert can say whether it is "negligent for a gynecologist to diagnose and treat generalized anxiety in a patient or to determine that a patient having her service animals helps with this disorder." To be sure, these matters of diagnosis and treatment fall within the scope of the statutory definition of "medical care" that a physician provides to a patient. *See* TEX. CIV. PRAC. & REM. CODE § 74.001(a)(19); TEX. OCC. CODE § 151.002(a)(13). But the Waldroups have explained throughout this case that they "do not take issue with Dr. Leibman's diagnosis that Ms. Romano suffered from an anxiety disorder, nor even his professional opinion that a 'service animal' could assist [her] with her daily activities and be part of a treatment program

12

for her anxiety." And we have found no evidence in the record to suggest that any of this medical care was negligent. Because Dr. Leibman's diagnosis and medical opinion are not "*operative* facts . . . *relevant* to the alleged injury," *Collin Creek*, 671 S.W.3d at 885 (emphasis added), it cannot be the case that "expert medical . . . testimony is *needed* to establish the requisite standard of care and breach." *Bioderm*, 426 S.W.3d at 760 (emphasis added).

So what does the record show is the operative breach by Dr. Leibman relevant to the child's injury? *See Collin Creek*, 671 S.W.3d at 885 ("Courts must focus on the set of operative facts underlying the claim that are relevant to the alleged injury." (internal quotation marks omitted)).[3] As explained, it is not Dr. Leibman's diagnosis of Romano's disorder or the opinion that a properly trained service animal would treat it. Nor is it Dr. Leibman's statement that Kingston was certified to be with Romano, or Dr. Leibman's opinion that Kingston actually assisted in treating her anxiety by walking into every entrance before her. The record shows that Romano obtained service-dog credentials for Kingston from USA Service Dog, and Dr. Leibman points to nothing in the record that could support a claim that Kingston was uncredentialed. *See Collin Creek*, 671 S.W.3d at 885-86 (explaining that courts consider the entire record to determine whether it could support an HCLC). Similarly, the Waldroups confirmed at oral argument that they make no claim Kingston did not assist in treating Romano's anxiety, nor has Dr. Leibman identified a record basis for asserting such a claim.

---

[3] We reject the dissent's characterization of this opinion as relying only on allegations and not also considering the record. *Post* at 2, 5-7.

13

Instead, the tortious conduct the Waldroups identify is that Dr. Leibman's reference to Kingston as a service animal included an implied representation that the dog was appropriately trained to behave in public, and that Dr. Leibman made this representation without taking steps to ascertain the dog's temperament. Kingston's attack on R.W. is certainly evidence that there were problems with the dog's temperament, and the Waldroups rely on that evidence in pressing their separate negligence claim against Romano. But we see nothing in Dr. Leibman's letters concerning Kingston's behavior other than the statement that Kingston "walks into every entrance before [Romano]," which relates to the dog's undisputed assistance with Romano's anxiety—not its temperament toward third parties. The letters do refer to Kingston as "certified" and a "service animal," but nothing in the record indicates whether any such designation entails training related to temperament toward the general public.

But even if there were an implication in the letter regarding Kingston's general temperament, the dispositive question would be whether a medical expert report is needed to prove or refute an applicable standard of care and breach. The answer is no because opinion testimony regarding a dog's general temperament is the province of veterinarians and dog trainers, not physicians. As discussed, the Act requires an expert report about "claimed departure[s] from accepted standards of medical care," which are "act[s]" of "diagnosis" or "treatment" of "a mental or physical disease or disorder" that are "performed or furnished" by a doctor "for, to, or on behalf of a patient during the patient's care [or] treatment." TEX. CIV. PRAC. & REM. CODE

14

§ 74.001(a)(13), (19); TEX. OCC. CODE § 151.002(a)(13). Evidence of "status *as a physician*" and of statements made "in the context of . . . medical care" is not sufficient by itself to meet the plain text of this standard. *Cf. post* at 9-10. A doctor's implication about a dog's comportment with third parties is not diagnosing or treating any disorder for a patient, so there can be no "applicable standards of [medical] care" to address in an expert report. *Collin Creek*, 671 S.W.3d at 885. The parties have not drawn our attention to any sources indicating that a doctor has a medical role to play in evaluating a particular animal's training. Nor has Dr. Leibman articulated why a medical duty or standard of care would govern non-medical representations by doctors that never come into the hands of plaintiffs or relevant third-party actors who are strangers to the physician–patient relationship.

Our decision in *Weems* provides a useful contrast that proves this very point. There, the suit challenged opinions by a treating nurse about the cause of her patient's injuries, which we held could support a claim for departure from accepted standards of professional services directly related to health care. 575 S.W.3d at 364-66 & n.37. Here, neither the Waldroups' allegations nor the record disclose any opinions about Romano or her care that are relevant to the alleged injury. In addition, considering the totality of the circumstances, we see nothing else to indicate that an expert report from a physician would assist the trier of fact in deciding any disputed factual question. For these reasons, we hold that the Act does not require a report.

15

Our dissenting colleagues afford considerable weight to this Court's observation that the Act "essentially creates a presumption that a claim is an HCLC if it is against a physician or health care provider and is based on facts implicating the defendant's conduct during the course of a patient's care." *Loaisiga*, 379 S.W.3d at 256. But the Act's text does not contain a true presumption in the legal or evidentiary sense. Instead, *Loaisiga* made the common-sense point that a claim usually will meet the statutory definition of an HCLC when the injured party is the defendant's patient. *Id.* at 252 ("We hold that the [Act] creates a rebuttable presumption that *a patient's claims* against a physician or health care provider based on facts implicating the defendant's conduct during the patient's care, . . . are HCLCs." (emphasis added)). Within this context, *Loaisiga*'s observation makes sense: it is reasonable to expect that a patient's interactions with her doctor "during the course" of her care will consist primarily of medical care. *Id.* at 256.

Here, the Waldroups are not Dr. Leibman's patients; although they have sued his former patient, they are strangers to the physician–patient relationship that our cases have often relied upon in applying this so-called presumption. We have applied *Loaisiga*'s observation to a third-party claim at least once, *see Weems*, 575 S.W.3d at 363, but there is less reason to believe that every action taken by a physician that affects a *non-patient* will constitute medical care.

Moreover, we have said that *Loaisiga*'s observation applies "[w]hen a claim brought against a health care provider is 'based on facts implicating the defendant's conduct during the course of a patient's care,

16

treatment, or confinement.'" *Weems*, 575 S.W.3d at 363 (quoting *Loaisiga*, 379 S.W.3d at 256). In this case, although Dr. Leibman wrote letters for Romano while she was his patient to help her avoid eviction, we see no indication in the record that the epistolary conduct occurred "during the course of [her] care" or treatment as our prior cases understand that phrase. Not every action that a doctor takes that bears any connection to his patient is done in the course of providing medical care, and concluding otherwise would expand the expert report requirement beyond any rational limits. Rather, "during the course of" indicates that the conduct must be considered a part of the patient's medical care—that is, of her diagnosis or treatment. *See* TEX. CIV. PRAC. & REM. CODE § 74.001(a)(13), (19); TEX. OCC. CODE § 151.002(a)(13). The dissent points to no case in which we have held that an activity occurred "during" care or treatment *solely* because the person was the doctor's patient at the time.

For these reasons, we conclude no HCLC presumption applies on these facts. But even if there were such a presumption, the record rebuts it here. As mentioned above, the Waldroups have consistently denied that their claims arise from Dr. Leibman's diagnosis of Romano's anxiety disorder or his opinion that a service animal would help treat that anxiety. Instead, their claims focus solely on Dr. Leibman's letters and his alleged failure to determine whether Romano's dog really was a properly trained service animal with appropriate public behavior. Just as the connection between those letters and the plaintiffs' injuries is so thin that the Waldroups barely make it over the standing threshold, *see supra* Part I, so too does that tenuous connection compel us to conclude

17

that the claims are not HCLCs. The record contains no evidence that Romano showed the letters to anyone, and there is nothing to suggest that Dr. Leibman wrote the letters as part of treatment he furnished for anxiety. Dr. Leibman did not write the letters while Romano was in a treatment facility, nor were the letters intended to help her obtain any medications or examinations. Anyone—with or without medical training—could have described the dog's behavior and temperament. Any presumption that the plaintiffs' claims are HCLCs is therefore rebutted, and these facts confirm that the totality of the circumstances does not support treating the claims as HCLCs. *See Gaytan*, 640 S.W.3d at 846 (looking to totality of the circumstances to determine whether claimant rebutted presumption).

Finally, Dr. Leibman and the dissent contend the Waldroups' claims are HCLCs because they are "inseparable from" or "inextricably intertwined with" Dr. Leibman's medical treatment of Romano. *Id.* (collecting cases). We reject this argument for many of the same reasons that the presumption is inapplicable and, in any event, rebutted. *See id.* (treating inseparability as part of "totality of the circumstances" inquiry). In particular, our cases applying this inseparability principle have involved suits by patients alleging that the medical or health care they were provided fell below the standard of care. Here, however, the suit is not by a patient, and neither the plaintiffs' allegations nor the record show that any diagnosis or treatment Dr. Leibman provided to Romano fell below an applicable standard of medical care. Similarly, given the lack of any claim based on Romano's diagnosis or treatment, our cases that prohibit "claim splicing" or "splitting" into multiple causes

18

of action to avoid alleging an HCLC are not implicated here. *See, e.g.,*
*id.* at 838 & n.5.

## CONCLUSION

For these reasons, we conclude that the Waldroups' claims are not
HCLCs for which they were required to file a preliminary expert report.
We therefore affirm the court of appeals' judgment and remand the case
to the trial court for further proceedings.

J. Brett Busby
Justice

**OPINION DELIVERED:** June 6, 2025